**MKP ENTERPRISES, INC., Petitioner**

v.

**UNDERGROUND STORAGE TANK INDEMNIFICATION BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 13, 2011.

Decided Feb. 9, 2012.

Reargument Denied March 28, 2012.

Matthew L. Wolford, Erie, for petitioner.

Amy L. Weber, Harrisburg, for respondent.

BEFORE: COHN JUBELIRER, Judge, and BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge BROBSON.

Petitioner MKP Enterprises, Inc. (hereafter EPI)[1] petitions for review of an order of the Underground Storage Tank Indemnification Board (Board), which rejected exceptions EPI filed to a hearing officer's proposed report and recommendation and adopted the proposed report. The Board, in adopting the proposed report, rejected EPI's claim for benefits from the Underground Storage Tank Indemnification Fund (the Fund).[2] We affirm the order of the Board.

## I. BACKGROUND

### A. Triggering Event

EPI is in the business of buying, selling, storing, and distributing refined petroleum-based products, including gasoline and diesel fuel. (Stipulated Finding of Fact (S.F.F.) No. 2; Reproduced Record (R.R.) at 3a.) EPI has an underground storage tank (UST) system located at its main facility in the City of Erie. (S.F.F. No. 3; R.R. at 3a.) On November 6, 2007, EPI began to have three USTs, containing either unleaded gasoline or diesel gasoline, excavated. (S.F.F. No. 4–5; R.R. at 3a.) During the excavation process, "[s]oil [c]ontamination was found ... [which] was believed to be [the] result of leaking around the spill buckets." (S.F.F. Exhibit A; R.R. at 18a.) The three USTs were removed and replaced on November 7, 2007. (S.F.F. No. 5; R.R. at 3a.)

### B. Fund's Denial of EPI's Claim

On April 14, 2008, EPI's Operations Manager, Michael Callahan, reported the claim to the Fund by telephone call. (S.F.F. No. 6; R.R. at 4a; S.F.F. Exhibit A; R.R. at 14a.) On May 19, 2008, Ron Moore, of ICF International, the Fund's third-party administrator (Fund Administrator), advised EPI by letter that its claim was denied because EPI failed to notify the Fund within sixty (60) days after EPI had confirmed the release of the contaminating materials. (S.F.F. No. 9; R.R. at 4a; S.F.F. Exhibit C; R.R. at 156a.) Mr. Callahan, on behalf of EPI, sent a letter to the Fund on June 12, 2008, seeking to challenge the decision to deny EPI's claim. (S.F.F. No. 10; R.R. at 4a; S.F.F. Exhibit D; R.R. at 159a.) On August 25, 2008, Steven Harman, the Executive Director of the Fund, sent a letter to EPI, denying EPI's claim on the same grounds as the Fund Administrator. (S.F.F. No.

---

1. Petitioner MKP Enterprises, Inc. is the successor company to Erie Petroleum, Inc. (EPI). Because the order from which EPI has appealed, as well as the parties' briefs, refers only to EPI rather than the successor company, we will refer to the petitioner throughout this opinion as EPI.

2. The Fund was created pursuant to the law known as the Storage Tank and Spill Prevention Act, Act of July 6, 1989, P.L. 169 (the Act), 35 P.S. §§ 6021.101–.2104.

11; R.R. at 4a; S.F.F. Exhibit E; R.R. at 164a–66a.)

## C. Proceedings Before the Board

### 1. Administrative Hearing Before the Presiding Officer

On October 1, 2008, EPI filed a request with the Board for an administrative hearing. (R.R. at 197a–98a.) The Board appointed James A. Johnson as Presiding Officer (PO) for the hearing. (Record Item D.) Ultimately, the parties filed stipulations of fact and pre-hearing statements. The parties agreed that the PO could decide the merits of the case on the basis of the stipulated record. The PO issued factual findings and concluded that EPI was ineligible for coverage under the Act, because EPI failed to notify the Fund of the contamination within sixty (60) days of confirmation of the release of the contaminants.

### 2. Board's Adjudication and Order

EPI filed objections with the Board, seeking to challenge the PO's Recommended Report. The Board issued an adjudication and order, adopting the PO's Recommended Report. In that adjudication, the Board rendered the following narrative summary of the key factual elements of the case:

> Michael Callahan . . . was present on November 6 when the excavation began, as was James Chestnut, the president of [Professional Petroleum Services, Inc. (PPI) ], who supervised the tank removal for [PPI].
>
> During the excavation, [PPI] personnel, including Mr. Chestnut, encountered what they believed to be extensive contamination. The contamination was evidenced by the following: (a) severe odor and staining of the soil; (b) very obvious pyramid-shaped staining from each of the spill buckets above the tanks that

ran down the side of the tanks; (c) at least two of the spill buckets were broken and appeared to be leaking and in one of them, the bottom was broken out; (d) the company's vapor detection meter indicated petroleum contamination; and (e) impacted soil which appeared to extend beyond the limits of what was excavated.

> Because of the discovered contamination, Mr. Callahan was called to the excavation pit and observed the condition of the tank pit. Mr. Callahan had a brief conversation with Mr. Chestnut about the contamination. According to Mr. Callahan, Mr. Chestnut "said that he did find some contamination" and told Mr. Callahan of his conclusion that a release had occurred. Mr. Chestnut also informed Mr. Callahan that [PPI] was required to report a release to the Pennsylvania Department of Environmental Protection ("DEP") and that [PPI] would get some confirmatory soil samples to determine the extent of impacted soil for the purpose of DEP's evaluation of whether to order a site assessment/characterization.

> [PPI] reported the release to Susan Frey of DEP by telephone on the same day of the excavation, November 6, 2007. Consistent with her usual practice, Ms. Frey . . . documented the report on a form including information about who notified her of the claim, the owner and a description of what was reported. Ms. Frey distributed copies of the completed one-page storage system report form to appropriate DEP personnel and also faxed a copy to [the Fund], as was her usual practice. Transmitting a report form to [the Fund] is not required, and not all regional DEP offices send the forms; forms received by [the Fund] generally are retained for 60 days in the

event a claim is reported corresponding to DEP's report form.

A Water Quality Specialist at DEP, Arthur Meade, received the storage system report form shortly after it was prepared, and on November 7, 2007, Mr. Meade visited the site. From his inspection, Mr. Meade observed what he considered to be a reportable release as defined by storage tank regulations. On November 27, 2007, DEP received a Notification of Reportable Release form ("NORR") from [EPI] and [PPI]. The NORR bore Mr. Callahan's original signature dated November 9, 2007 and an undated signature of [PPI]'s representative. *Check marks on the second page of the NORR indicated that contamination by unleaded gasoline and diesel fuel products was confirmed for the site.*

[PPI] obtained soil samples at the site on November 7 and November 28, 2007. *[PPI] prepared DEP's Storage Tank Closure Report form ("Closure Report") for each tank on December 13 and 14, 2007, although the results from the sampling were not yet back from the laboratory. The Closure Report form noted obvious contamination attributable to each excavated tank appearing to be "from damage or malfunctioning spill buckets."* [PPI] sent the signature page for section one of the Closure Report to Mr. Callahan via facsimile on December 26, 2007 and Mr. Callahan returned it via facsimile the following day after signing and certifying that the informa-

tion in the completed Closure Report was true, accurate and complete. [PPI] sent the completed Closure Report to DEP on or about January 9, 2008 and [EPI] received the completed Closure Report the same day.

(Board Adjudication and Order at 2–3 (emphasis added).) The Board rejected EPI's exceptions to the Proposed Report and adopted the PO's Proposed Report and Recommendation in full.

### D. Petition for Review

■ EPI petitioned this Court for review of the Board's adjudication and order,[3] raising twelve issues. One issue EPI raises is whether certain factual findings are supported by substantial evidence. EPI also raises a number of issues relating to the regulatory notification requirement that is at the heart of this appeal, 25 Pa.Code § 977.34 (hereafter Section 977.34). That regulation provides, with regard to claim reporting, that "[t]he participant shall notify the Fund within 60 days after the confirmation of a release under [25 Pa.Code] §§ 245.304 and 245.305 (relating to investigation of suspected releases; and reporting releases)."[4]

With regard to this regulation and the Board's decision, EPI asserts that the Board erred in concluding that EPI did not satisfy Section 977.34's reporting requirements either on November 6, 2007 (the date of the excavation of the USTs) or April 14, 2008 (the date Mr. Callahan tele-

---

**3.** In accordance with Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704, in an appeal from a decision of a state agency, this Court's standard of review is limited to considering whether substantial evidence supports necessary factual findings and whether the administrative agency erred as a matter of law or violated any constitutional rights.

**4.** The pertinent regulations define the term "participant" to include an owner or operator

of an UST or a "certified company." 25 Pa.Code § 977.4. The same regulation defines the term "certified company" to mean "[a]n entity, including, but not limited to, a sole proprietorship, a partnership or a corporation, which is authorized by the DEP to conduct tank-handling activities, tightness testing activities or inspection activities using certified installers, certified inspectors or both."

phoned the Fund regarding EPI's claim relating to the contamination). EPI also argues alternatively that its April 14, 2008 telephone claim satisfied the notification requirements of Section 977.34 in light of the reference in Section 977.34 to 25 Pa. Code § 245.304. Also, EPI contends that the Board applied an incorrect legal standard in determining the "notification accrual date" under Section 977.34. In the same vein, EPI asserts that the allegedly new legal standard the Board applied to determine the "notification accrual date" under Section 977.34 constitutes de facto rule making and thereby violates the law commonly known as the Commonwealth Documents Law.[5]

Additionally, EPI argues that the notification requirement contained in Section 977.34 and the Board's construction of that regulation are not consistent with the enabling legislation of the Act. Also, with regard to Section 977.34, EPI contends that federal law preempts this regulation. EPI also argues that the application of Section 977.34 violated EPI's constitutional rights based upon the failure of the regulation to identify the office and/or agency an operator must notify regarding contamination.[6]

EPI makes three additional arguments: (1) whether the Board erred by failing to consider the effect of regulations relating to mandatory sampling reflected in 25 Pa. Code § 245.304 and permanent tank closures addressed in 25 Pa.Code § 245.453; (2) whether the Board erred in not permitting EPI to submit its claim nunc pro tunc; and (3) whether the Board's decision and holding in *In re Harrisburg Jet Center*, UT04–08–025 (2005), applies in this case.

## II. ANALYSIS

### A. Relevant Statutory and Regulatory Provisions

The Act provides for the "establishment of a regulatory scheme for the storage of regulated substances in new and existing storage tanks and to provide liability for damages sustained ... as a result of release and to require prompt cleanup and removal of such pollution and released regulated substance." Section 101 of the Act, 35 P.S. § 6021.101. Section 704 of the Act, 35 P.S. § 6021.704, provides for the creation of the Fund and that the purpose of the Fund is for "making payments to owners, operators and certified tank installers of underground storage tanks who incur liability for taking corrective action or for bodily injury or property damage caused by a sudden or nonsudden release from underground storage tanks."

Section 705(b) of the Act, 35 P.S. § 6021.705(b), relating to claims, provides the Board with the authority to "establish procedures by which owners, operators and certified tank installers may make claims for costs estimated or incurred in taking corrective action ... caused by a sudden or nonsudden release from underground storage tanks." Of additional significance to this matter, Section 706 of the Act, 35 P.S. § 6021.706, relating to eligibility of claimants, provides that "in order to receive a payment from the Fund, a claimant shall meet the following eligibility requirements: (1) The claimant is the owner ... of the tank which is the subject of the claim ... [and] (6) [a]dditional eligibility requirements which the [B]oard may adopt by regulation."

Pursuant to its authority under Section 705(b)(6) of the Act, the Board promulgat-

---

**5.** Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102–1602.

**6.** EPI appears to argue that a regulation such as Section 977.34 must include such information for notice purposes.

ed regulations relating to the procedure by which an owner or operator may obtain payment for "corrective action" in response to a release of regulated substances. As suggested above, one of the regulations the Board adopted is Section 977.34—the sixty (60)-day notification requirement. The eligibility regulation the Board promulgated, 25 Pa.Code § 977.31(7), specifically requires "participants"[7] to meet the notification requirement of Section 977.34. Section 977.34 requires notification to the Fund within sixty (60) days of a "confirmation" of a release under regulations promulgated pursuant to the Act and the Clean Streams Law,[8] 25 Pa.Code §§ 245.304 and .305.

Chapter 245 of Title 25 of the Pennsylvania Code pertains to the administration of the storage tank and spill prevention program. Subchapter D of Chapter 245, in which Sections .304 and .305 are found, pertains to the "corrective action process for owners and operators of storage tanks and storage tank facilities and other responsible parties." 25 Pa.Code §§ 245.301–.314. As stated in Section 245.301, the purpose of Subchapter D is to establish "release reporting, *release confirmation* and corrective action requirements for owners and operators of storage tanks and storage tank facilities." (Emphasis added.)

Subsection 304 of Subchapter D specifically refers to the methods by which an owner or operator of a storage tank may confirm the release of a regulated substance. We quote that provision in pertinent part below:

Investigation of suspected releases.

(a) *The owner* or operator of storage tanks ... *shall* initiate and *complete an investigation of an indication of a release of a regulated substance as soon as practicable, but no later than 7 days after the indication of a release.*

. . .

(b) *The investigation* required by subsection (a) *shall include a sufficient number of the procedures outlined in this subsection and be sufficiently detailed to confirm whether a release of a regulated substance has occurred.* The owner or operator shall investigate the indication of a release by *one or more* of the following procedures:

(1) A check of product dispensing or other similar equipment.

(2) A check of release detection monitoring devices.

(3) A check of inventory records to detect discrepancies.

(4) *A visual inspection of the storage tank or the area immediately surrounding the storage tank.*

(5) Testing of the storage tank for tightness or structural soundness.

(6) Sampling and analysis of soil or groundwater.

(7) Other investigation procedures which may be necessary to determine whether a release of a regulated substance has occurred.

(c) *If the investigation confirms that a reportable release has occurred, the owner or operator shall report the release* in accordance with § 245.305 ... and initiate corrective action.

(d) If the investigation confirms that a *nonreportable release* has occurred, the owner or operator shall take necessary actions to completely recover or remove the regulated substance which was released.

---

**7.** As indicated in footnote 4, the term "participant" includes owners or operators of USTs.

**8.** Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §§ 691.1–.101

(e) If the investigation confirms that a release has not occurred, further investigation by the owner or operator is not required.

(Emphasis added.) [9]

This regulation generally requires that investigations of suspected releases be (1) completed within seven (7) days and (2) include sufficient procedures (as described in the regulation) to confirm whether a release has occurred.[10] The regulation makes no distinction, at the investigation stage or with regard to notification to the Fund, between reportable and non-reportable releases. If, following an investigation, an owner or operator determines that a reportable release has occurred, the owner/operator must report the confirmed release to DEP. If the investigation indicates that the release is a non-reportable release, the owner/operator has no duty to report the release to DEP, but must remediate the release.

### B. Issues on Appeal

#### 1. Whether Substantial Evidence Supports Necessary Factual Findings?

■ EPI contends that the PO's Findings of Fact numbers 24, 46, and 60 are not supported by substantial evidence. Courts have defined substantial evidence as "relevant evidence upon which a reasonable mind could base a conclusion." *Rohde v. Unemployment Comp. Bd. of Rev.*, 28 A.3d 237, 242 (Pa.Cmwlth.2011). In evaluating the record to determine whether there is substantial evidence to support the adjudicatory findings, this Court examines the testimony in the light most favorable to the prevailing party, giving that party the benefit of any inferences that can logically and reasonably be drawn from the evidence. *Id.* Courts engage in a substantial evidence analysis through examination of the record as a whole, *Taylor v. Unemployment Compensation Board of Review*, 474 Pa. 351, 355, 378 A.2d 829, 831 (1977), and may conclude that factual findings are binding in reviewing an appeal only when the record taken as a whole contains substantial evidence to support them, *Penflex, Inc. v. Bryson*, 506 Pa. 274, 286, 485 A.2d 359, 365 (1984).

#### a. Finding of Fact Number 24

■ Finding of Fact number 24 provides that "Mr. Chestnut also informed Mr. Callahan that [PPI] would get some confirmatory soil samples to determine the extent of impacted soil for the purpose of DEP's evaluation regarding whether to order a site assessment/characterization." EPI asserts that this finding of fact is not supported by substantial evidence, insofar as the finding provides that the reason for soil sampling was to determine the *extent* of soil contamination, rather than for the purpose of *confirming* that contamination occurred.

---

**9.** Additionally, Section 245.305 to which Section 245.304 refers, provides in pertinent part:

 (a) The owner or operator of storage tanks and storage tank facilities shall notify the appropriate regional office of the Department [of Environmental Protection] as soon as practicable, but no later than 24 hours, after the *confirmation* of a reportable release.

 (b) Upon the occurrence of a confirmed, reportable release, the owner or operator shall take necessary corrective actions to completely recover or remove the regulated substance which was released.

(Emphasis added.)

**10.** Section 245.1 defines a "reportable release" by reference to known and unknown quantities of a released regulated substance and excludes certain releases based upon such matters as segregated releases and quantities of a release in certain circumstances.

In making this factual finding, the PO referenced both Mr. Chestnut's affidavit and "statement." [11] (R.R. 282a–85a.) In his affidavit, Mr. Chestnut made several key statements: (1) "I am never sure that a release has occurred until confirmed by soil sampling. However, I concluded during the UST Work that I believed a release had occurred based on my observations and information." (Chestnut affidavit, ¶ 5; R.R. at 279a); (2) "I explained to Mr. Callahan my conclusion that a release had probably occurred, but do not recall what specific details I explained. I believe that I described the damaged spill buckets, but I do not recall explaining that [PPI] detected petroleum vapors using an OVD meter. I believe that Mr. Callahan observed the presumed contamination." (*Id.* at ¶ 6(b)); and (3) "I explained to Mr. Callahan that [PPI] needed to call ... DEP, and that confirmatory soil samples would be obtained. In response, Mr. Callahan stated that EPI would wait to review the results of confirmatory soil sampling before retaining an environmental consultant and performing any remedial work to address DEP's regulatory requirements. In this regard, Mr. Callahan stated that, in his experience, it is prudent to wait until ... DEP and EPI have an opportunity to review the confirmatory soil sampling to determine the next course [of] action." (*Id.* at ¶ 6(c).)

Although Mr. Chestnut's affidavit suggests that the purpose of the soil sampling was to confirm contamination, Mr. Chestnut's "statement" suggests that the purpose of soil sampling was to determine the extent of soil contamination:

Q: Was there any conversation between you and [Mr.] Callahan with regards to ... what appeared to be contamination there at the site?

A: I think what we did when we hit it, we brought him out to show him what we thought we had. And then he indicated that we should stockpile it off to the one end of the property on the plastic. It would [be] out of the way for him. *And you know, we had mentioned that we needed to call DEP and get some confirmatory soil samples and see where it goes from there, I guess, as far as how extensive the soil is* and what DEP thinks as far as if they would order a site assessment. It was obviously extended beyond, I think they usually give us a 2–3 foot area that if we can get it, go ahead and dig it and if not then they usually need a site assessment. We discussed things like that. That I wanted to get the soil samples back, that DEP would probably contact them and tell them they wanted a site assessment, or site characterization I should say maybe.

(R.R. at 284a (emphasis added).) Mr. Chestnut's affidavit, while referencing the need for confirmation of contamination, could be reasonably viewed as relating to the need to confirm the extent of contamination. Mr. Chestnut's reference to soil samples in his statement, however, indicates that the purpose of the soil sampling was to determine "how extensive the soil [contamination] is." The more specific comment Mr. Chestnut made in his statement is one that a reasonable person could rely upon to conclude that the purpose for the sampling in question was to determine the extent of contamination of the surrounding soils, rather than whether any

11. According to the PO's Proposed Report and Recommendation, various persons made "statements" on which he relied. The statements are "transcribed interview[s] with an investigator for the Fund's third party admin-istrator," which are attached to the affidavits of those persons who made "statements" and certified as true by the affiant of the particular affidavit. (R.R. at 335a; PO's Proposed Report and Recommendation at 5.)

contamination occurred. Because our duty is to examine the entire record, and because there is evidence in the record supporting the factual findings that PPI determined at the time of excavation (based upon, among other matters, an extreme odor of petroleum) that contamination had occurred, we conclude that substantial evidence supports Finding of Fact number 24.

### b. Finding of Fact Number 60

Finding of Fact number 60 provides that "EPI received the completed closure report with soil sample results on or about January 9, 2008." The PO based this factual finding on Findings of Fact numbers 54–59, which provide:

54. [PPI] sent the signature page for Section 1 of the closure report to Mr. Callahan via facsimile on December 26, 2007 and Mr. Callahan returned it via facsimile the following day after signing and certifying that the information in the closure report was true, accurate and complete.

55. [PPI] sent the completed closure report to DEP on or about January 9, 2008.

56. The completed closure report submitted to DEP on January 9, 2008 included laboratory analysis of the contaminated soil, and included the facsimile signature page.

57. DEP requested an original signature page, so [PPI] obtained one from Mr. Callahan and submitted another copy of the closure report with original signatures on or about February 4, 2008.

58. [PPI] provided Mr. Callahan with the completed closure report which included the soil sample analysis results.

59. The completed closure report with soil sample results supplied to EPI was the version sent to DEP on January 9,

2008 including the facsimile signature page.

(R.R. at 341a–42a.)

We reiterate that in considering substantial evidence challenges, we must review the record as a whole. *Chapman v. Unemployment Comp. Bd. of Review,* 20 A.3d 603, 608 (Pa.Cmwlth.2011). Although an adjudicator may rely upon inferences in adopting a factual finding, there must be substantial evidence in the record to support the inference drawn. *See Joyner v. Workmen's Comp. Appeal Bd. (Pittsburgh Steelers Sports, Inc.),* 667 A.2d 13, 16 (Pa. Cmwlth.1995). The party prevailing below is entitled to have the Court view the evidence in the most favorable light and to all reasonable inferences that may be derived therefrom. *Chapman,* 20 A.3d at 608. We have defined substantial evidence to mean evidence that a reasonable mind could accept as adequate to support a conclusion. *Polk v. Workmen's Comp. Appeal Bd. (Sambo's Restaurants, Inc.),* 522 Pa. 349, 353, 561 A.2d 1229, 1231 (1989). Further, evidence will be substantial to support such an inferential finding only when the record evidence is more than a scintilla and creates more than mere suspicion that a particular fact exists. *Id.*

The PO, in making Findings of Fact numbers 54–59, relied upon the documentation contained in Stipulation Exhibit B. Those facts create more than a suspicion that Mr. Callahan was aware of the soil sample results. The documents in Stipulation Exhibit B include not only the above-referenced signature of Mr. Callahan that certified the truth and accuracy of the closure report, but also include a proposal dated January 18, 2008, which PPI sent to Mr. Callahan's attention at EPI. (R.R. at 142a.) The first paragraph of the proposal provides that "[t]he following is a Time & Material estimate to remove, transport, and dispose of approxi-

mately fourteen hundred (1400) tons of petroleum impacted soil at an approved waste treatment facility from the above[-]referenced site in Erie." (*Id.*) Under the caption "Scope of Work," the proposal provides that "[PPI] will coordinate with a DEP certified waste transportation company, schedule and mobilize to the site equipment and personnel to load and transport the remaining contaminated stockpiled soil on site from the recent UST removal activities." (*Id.*) The final "Note" on the proposal additionally provides that "the proposed work scope is based on the approximate fourteen hundred (1400) tons of contaminated stockpiled soil on site." (*Id.*)

Accordingly, to the degree that the PO's ultimate factual finding is based upon inference, we conclude that there is substantial evidence in the record to support the inferential factual finding in Finding of Fact number 60, because we view the record as supporting more than a mere suspicion that, for the purpose of determining that Mr. Callahan had actual knowledge of the contamination, Mr. Callahan received the closure report on or about January 9, 2008.

### c. Finding of Fact No. 46

■ In footnote 20 of its Brief, EPI also challenges Finding of Fact number 46, which provides that "Mr. Callahan knew in November 2007 that a release of regulated substance had occurred which had contaminated at least the soil surrounding the tanks." (R.R. at 340a.) The PO based this ultimate factual finding on Findings of Fact numbers 8–45. Specifically, Finding of Fact number 40 indicates that on November 27, 2007, DEP received a "Notice of Reportable Release" (NORR) from EPI and PPI. (Factual Finding found in R.R. at 339a; NORR found in R.R. at 311a–14a.) It is clear that the PO based his conclusion in part on the NORR, which contains (1)

an identification of November 6, 2007, as a date of confirmation of a reportable release, (R.R. at 312a), and (2) Mr. Callahan's signature, (R.R. at 314a). Based upon the foregoing, we conclude that substantial evidence supports Finding of Fact number 46.

### 2. Whether the Board Erred With Regard to EPI's Challenges Arising Under 25 Pa.Code Section 977.34?

a. Whether the Board erred in concluding that EPI did not satisfy the notice requirements of Section 977.34 based upon the notice PPI sent to DEP in November, 2007, and which, in turn, DEP sent to the Fund?

The PO determined as a fact that, on November 6, 2007, (the date PPI performed excavation of the tanks and discovered the release) PPI informed EPI that it was required to notify DEP of a release. (F.F.23.) The PO also determined that PPI reported the release on November 6, 2007, to Susan Frey of DEP. (F.F.29.) Ms. Frey documented PPI's report regarding the release, which she distributed to DEP personnel, and also faxed a copy of the report to the Fund. (F.F.30.)

■ Based upon the fact that DEP faxed the report to the Fund, EPI first argues that it satisfied the notice requirements of Section 977.34 by virtue of the verbal notification PPI provided to DEP on November 6, 2007. As indicated by the findings of fact, when PPI reported the situation at the site, Ms. Frey summarized the information in a "Storage System Report Form Notification Information" form (Notification Form) for DEP, which she also transmitted to the Fund. EPI suggests that this communication provided the Fund with all the information the Fund needed regarding a release of a regulated substance for the purposes of notification

under Section 977.34. Section 977.34, however, requires a "participant" to notify the Fund. EPI suggests that requiring a "participant," as compared to any other entity or person, to provide the Fund with notice within sixty (60) days after confirmation of a release raises form over substance. We disagree.

As an entity functioning in a capacity similar to an insurer, it is reasonable that the Fund would desire notice within a particular amount of time of a triggering event—confirmation of a release—that a *"participant"* will be making a claim against the Fund. Until such time, the Fund would have no notice that a "participant" will seek to recover the costs of remediation from the Fund. We also do not agree with EPI that this view represents a type of underhanded scheme the Fund has developed to avoid its obligations under the Act. In order for the Fund to fulfill its statutory and regulatory obligations, it is reasonable to require "participants" to notify the Fund in a timely manner that an event has occurred for which a "participant" *may* be seeking compensation under the Act. Neither the Act nor the regulations suggest that a "participant's" right to compensation will be limited only to those costs that are determined before remediation is complete. Thus, there is no reason for a "participant" to delay notification beyond the sixty (60)-day limit, once a "participant" confirms that a release has occurred.[12]

Additionally, EPI suggests that DEP is authorized to submit a claim on EPI's behalf and that DEP's submission to the Fund of the Notification Form thereby satisfied EPI's notice requirement under Section 977.34. EPI relies in this regard upon Mr. Callahan's affidavit, in which he states that "[i]f [the Fund] would have asked EPI to verify that Susan Frey and/or DEP were authorized to submit the report to [the Fund] on or about November 6, 2007, EPI would have done so." (R.R. at 261a; Affidavit, ¶ 24.) EPI argues that a statement in the Fund's 2007 Annual Report, which indicates that the Fund will accept notifications from agents designated by owners or operators, supports EPI's position. The questions of whether EPI could have effectively authorized DEP to act as its agent and *whether DEP could act as its agent if authorized* are purely hypothetical. Simply stated, the record does not justify engaging in that analysis, as there is no record support for the proposition that EPI authorized DEP to act on EPI's behalf.

EPI also argues that the Board erred by basing its decision in part on the conclusion that the Notification Form DEP sent to the Fund is not a "claim." We believe that our discussion above concerning the necessity of a *"participant"* to submit notification within sixty (60) days of confirmation of a release renders this argument irrelevant. EPI also contends that because the Act is remedial in nature, the Board erred in construing the notification provision too strictly. EPI asserts that the Board should have liberally construed the regulation and applied a presumption of eligibility. While advocating a liberal construction of the notification regulation, EPI offers no suggestion as to how the Board should stretch the interpretation of the notification requirements of Section

---

12. EPI also asserts that PPI, as a "certified company," is also a "participant" and that, therefore, PPI's act of notifying DEP (and DEP's notification to the Fund) satisfied the eligibility requirement set forth in Section 977.34. We disagree. Although PPI, as a presumed "certified company," may also be a "participant" and thus, perhaps, might have had the authority to notify the Fund of the release, PPI, just as EPI, never notified the Fund of the release. Thus, we find no merit in this argument.

977.34 in a consistent manner. EPI's argument, however, essentially asks the Court to invoke a construction of Section 977.34 that would not simply be a liberal one, but rather one that would render the regulation virtually meaningless.

EPI asserts that by virtue of the fact that the Notification Form contained information provided by "participants" (PPI and EPI), once DEP sent the Notification Form to the Fund, the Fund had all the information it needed in order for EPI to have fulfilled its obligation under Section 977.34. We disagree for the reasons suggested above. The regulatory scheme adopted pursuant to the Act reflects two distinct concerns—notice to DEP for the purpose of its statutory and regulatory oversight responsibilities and notice to the Fund *if* an owner/operator/participant seeks to recover the costs of remediating releases. As the Board notes, the Fund is not an interested entity unless and until an owner or operator seeks to recover the costs of remediating a release. Notice of a release is not the same as notice of intent to pursue a claim against the Fund.

EPI further contends that the notice PPI provided to DEP in the Notification Form was sufficient to satisfy the notification requirements of Section 977.34, because Section 977.34 does not specifically direct owners or operators to file notification of a claim with the Fund. Rather, EPI asserts that, because Section 977.34 expressly references other regulations pertinent to DEP's responsibilities under the Act, it is reasonable to construe Section 977.34 as only requiring notice to DEP. The other regulations to which Section 977.34 refers are found at 25 Pa.Code §§ 245.304 and 245.305, which we have quoted above.

EPI develops its argument as follows. The Act created the Board, which is the administrative body that undertakes the function of addressing claims that owners or operators make against the Fund. EPI relies upon the fact that Section 977.34, which provides for "[c]laims reporting," refers to requests "for coverage and reimbursement from *the Fund.*" EPI stresses that the regulation does not specify the entity to which such requests should be addressed. EPI argues that because Section 977.34 refers to 25 Pa.Code §§ 245.304 and 245.305, Section 977.34 contains an implication that an owner should notify DEP rather than the Fund.

As discussed further below, Sections 245.304 and .305 are relevant to Section 977.34 because they describe the manner by which an owner or operator may confirm that a release has occurred. Those sections, however, do not address in any respect notification for the purpose of claims for coverage from the Fund. EPI is essentially suggesting that the latter phrase of Section 977.34, which is "under §§ 245.304 and 245.305" modifies the preliminary phrase of Section 977.34, such that we should construe Section 977.34 to state in part as follows: "The participant shall notify the Fund under §§ 245.304 and 245.305," rather than "[t]he participant shall notify the Fund within 60 days after a release that *is confirmed under* §§ 245.304 and 245.305." (Emphasis added.)

For the reasons expressed earlier concerning the distinct administrative roles of the Fund and DEP in the UST statutory and regulatory scheme, we conclude that EPI's proffered interpretation is erroneous. The notification requirements contained in Sections 245.304 and 245.305 refer only to DEP's responsibility in supervising the remediation of UST releases and do not mention notification to DEP of claims against the Fund. Moreover, in December 2001, the Fund issued a "Fund Eligibility Alert" regarding the sixty (60)-

day notice requirement. That notification advised tank owners that "[t]he tank owner/operator is required to notify the Fund within 60 days of a known release." (R.R. at 195a.) We agree with the Board that the overall scheme of the regulations makes clear that owners and operators seeking to make a claim against the Fund must initiate a claim *with* the Fund and that such owners and operators have adequate information as to how and where to notify the Fund regarding a claim on a confirmed release. Consequently, we reject these arguments.

b. Whether EPI's notification to the Fund on April 14, 2008, was timely under Section 977.34?

 EPI argues that it did not receive confirmation of soil sample results until April 14, 2008, and that, therefore, the sixty (60)-day notification requirement of Section 977.34 did not begin to run until that date. As we stated above, the Board's necessary factual findings are supported by substantial evidence. Mr. Callahan's signature on the NORR indicated that he knew of a confirmed release in November 2007. Further, in the closure report process, which occurred during December 2007 and January 2008, EPI signed the reports submitted to DEP and received a proposal from PPI for the cost of removing the contaminated soil stockpiled on EPI's property. Thus, although EPI received an additional proposal and/or invoice from PPI in April 2008, the fact remains that EPI knew about the confirmed release in November 2007 and January 2008.[13] A straightforward construction of Section 977.34 requires notification within sixty (60) days of confirmation of a release, not within sixty (60) days of confir-

mation of the extent of the release. Therefore, we reject this argument.

c. Whether the reference in Section 977.34 to 25 Pa.Code §§ 245.304 and 245.305 means that *confirmation* of release does not occur until and unless such confirmation is established under those sections?

As indicated above, Section 977.34 requires a participant to notify the Fund within sixty (60) days of the confirmation of a release under Sections 245.304 and 245.305.

 As the Board noted, although soil sampling is one method by which an owner may comply with the investigation requirements of this regulation, the regulation does not stand for the proposition that, when an owner desires to perform additional tests that validate the confirmation of release based upon other criteria, the decision to perform such tests will toll the running of the sixty (60)-day period contained in Section 977.34. Rather, if an owner is able to confirm a release through other mechanisms, the sixty (60)-day period will begin to run from the date of confirmation by those other methods. In this case, as noted above, EPI, by virtue of the information PPI provided and as established by the acknowledgement in the NORR that PPI sent to DEP, confirmed the release in November 2007. Consequently, although EPI is correct in pointing out that soil sample testing may be used in order to confirm a release, in this case, other evidence provided PPI with confirmation of the release in November 2007, and triggered EPI's responsibility as a claimant under Section 977.34 to notify the Fund that it had a potential claim

13. As indicated below, although the record does not precisely indicate the date upon which EPI obtained the soil sample results,

the record does support the PO's finding that EPI had knowledge of the results sometime in January 2008 *at the latest.*

against the Fund. Accordingly, we reject this argument.

■ In a similar manner, EPI argues that the tank closure provisions contained in 25 Pa.Code § 245.453, which require soil sample testing, indicate that such testing is required before an owner can confirm that a release has occurred. The regulation, captioned as "[a]ssessing the site at closure or change-in-service," provides that "[b]efore permanent closure or a change-in-service is completed, owners and operators shall measure for the presence of a release where contamination is most likely to be present at the underground storage tank site. Owners and operators shall sample for releases." 25 Pa.Code § 245.453. As with Section 245.304 of the regulations, we view this provision as requiring sampling in order to complete the process of permanently closing or changing a tank, rather than for the confirmation of release. The regulation is apparently aimed at ensuring that, at the time an owner or operator elects to remove a tank or to replace a tank with a new tank, the site of the removal or change is free from contamination and suitable for a new tank. As the Board noted, Section 245.453 serves a function separate and distinct from the purposes of Section 977.34 relating to claims against the Fund. Therefore, we reject this argument.

### d. Whether Section 977.34 is contrary to the Act?

■ EPI argues that Section 977.34 is contrary to the remedial purposes of the Act, and, consequently, is invalid. The primary remedial purpose of the Act is to protect fully "the public health, welfare and safety of the residents of the Commonwealth." Section 109 of the Act, 35 P.S. § 6021.109. The General Assembly further declared that, through the regulatory scheme, the Fund could "provide liability for damages sustained within this Commonwealth as a result of a release and . . . require prompt cleanup and removal of such pollution and released regulated substances." Section 102(d) of the Act, 35 P.S. § 6021.102(d). The General Assembly undoubtedly elected to create the Board and the Fund in order to serve these objectives. The Fund, like any insurance system, is a vehicle that pools money, to enable owners to share in the burden associated with potential releases. Thus, where an owner/operator may at certain times lack the financial ability to pay the costs of a clean-up, the Fund provides a means of ensuring clean-up, which in turn benefits the residents of the Commonwealth.

■ EPI argues that the Board, by adopting Section 977.34, has defied the remedial purposes of the Act by placing an unlawful obstruction to Fund reimbursement before otherwise eligible claimants. EPI acknowledges that there may be a justification for some time limitation for the notification of a claim, but argues that sixty (60) days is an unreasonable time limitation. EPI contends that the Board elected an arbitrary limitation period and that a more reasonable limitation would be six months or a year. EPI asserts these arguments without citing any legal authority in support of them. Consequently, we could conclude that EPI has waived this issue. Pa. R.A.P. 2119; *Boniella v. Com.*, 958 A.2d 1069, 1072 n. 8 (Pa.Cmwlth.2008), *appeal denied*, 600 Pa. 376, 966 A.2d 551 (2009). We will, nevertheless, briefly address the key elements of this argument.

■ We note first that EPI does not attack the authority of the Board to adopt a regulation that limits the eligibility of an owner for coverage from the Fund based upon the timing of claim notification, but merely asserts that sixty (60) days is not lawful under the Act in light of the Act's

remedial nature. EPI suggests that the sixty (60)-day period is simply too short and that the Board should have adopted a longer time-limitation period such as six (6) months or one year.

Recently, this Court addressed a challenge to a regulation the Bureau of Workers' Compensation Fee Review Hearing Office adopted. *Fid. & Guar. Ins. Co. v. Bureau of Workers' Comp. (Cmty. Med. Ctr.)*, 13 A.3d 534 (Pa.Cmwlth.2010). In that case an insurance company sought to challenge a regulation relating to a time limitation within which providers were required to seek recovery of medical costs. The insurer argued that the regulation, contrary to the enabling statutory language, was invalid because it extended the filing period for a provider's application for fee review to ninety (90) days.

With regard to the invalidity argument, we noted in that case the distinction between legislative regulations and interpretive regulations, describing the former variety as one that is substantive in nature "and creates a new controlling standard of conduct while the interpretive regulation does not." *Id.* at 540. We also stated that "[g]enerally, a legislative regulation is valid if adopted pursuant to delegated legislative power in accordance with the appropriate administrative procedure, and if it is reasonable." *Id.* (internal citation omitted).

With regard to the regulation at issue in this case, the enabling legislation is silent as to a time-based eligibility requirement. Our General Assembly, however, provided the Board with the rule-making authority to add additional eligibility requirements for recovery from the Fund. Section 705(b) of the Act. Section 977.34 is a legislative regulation in that it provides for a standard of conduct, namely one that directs potential applicants to submit applications for recovery of remedial costs to the Fund

within a particular time frame. EPI does not suggest that the Board lacked the power to adopt additional eligibility requirements or that the Board failed to follow the administrative procedure for the adoption of a legislative regulation. Consequently, the only question we need to consider is whether the regulation is reasonable. EPI recognizes that the Board indicated in the rule-making process that "there have been instances where claims are reported years after the release actually occurred to the detriment of the Fund." (EPI Brief at 59, citing 30 Pa. Bulletin 6593, 6595.) EPI also candidly acknowledges that "it may be true that the Fund needs to identify claims in order to perform its annual actuarial analysis [in order to ensure solvency]." (EPI Brief at 59.)

Although EPI attempts to downplay these objective purposes of the regulation, we view these reasons as sufficient to support the conclusion that the regulation is reasonable. Accordingly, we conclude that the regulation is not contrary to the Act, and, therefore, is valid under the Act.

e. Whether federal law has
a preemptive effect on
Section 977.34?

■■■ EPI relies upon the requirements of Chapter IX of the federal Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6991–6991i—relating to the regulation of underground storage tanks— to argue that Pennsylvania's statutory and regulatory framework relating to storage tank issues is deficient. EPI argues that state environmental statutes enacted pursuant to federal delegation of authority under RCRA are valid only if they are at least as stringent and/or protective of the environment as federal counterparts. EPI, argues that Section 6991c(a)(6) of the RCRA, which requires states to adopt financial responsibility provisions to ensure funding for remediation of releases and

compensation for third parties who sustain physical injuries and/or property damage caused by releases, placed a duty upon Pennsylvania to adopt provisions that further that purpose. EPI contends that the regulations at issue in this case fail to accomplish those requirements. We disagree with EPI's argument for the reasons discussed below.

EPI, quoting from the "Delegation Request" the Board sent to the Environmental Protection Agency (EPA) in order to obtain approval for Pennsylvania's mechanism to fulfill its obligations under the federal law, notes that the request does not mention the catch-all provision of the Act. As indicated above, that provision authorizes the Board to adopt regulations that contain additional eligibility requirements, such as the sixty (60)-day notice requirement adopted in Section 977.34. EPI characterizes this communication with the EPA as a "misrepresentation," and contends that the Board obtained EPA approval without EPA's knowledge of the existence of Section 977.34.

EPI makes several sub-arguments with regard to its pre-emption claim: (1) the sixty (60)-day notice requirement renders the Act less protective of the environment and public safety than the federal law and the EPA-approved mechanism; and (2) citing a federal Section 1983 decision of the United States Supreme Court, *Felder v. Casey*, 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988), which involved application of the Supremacy Clause of the Federal Constitution, EPI claims that in this case, the Board's regulation improperly places restrictions on the vindication of rights created by federal law.

With regard to these arguments, EPI candidly admits that the *Felder* decision arose in a distinct legal context. With regard to EPI's claim that pre-emption applies, it should be noted that the crux of EPI's claim is simply that the EPA was not aware of the provision and that the provision improperly restricts the right to recover. EPI does not, in this regard, delve into an analysis of how Section 977.34 is so restrictive as to violate the federal law.

In response, the Board points out that the EPA did approve the state's mechanism, but that the Board has not requested the EPA to review Section 977.34. The Board argues, however, that there is no federal rule prohibiting a sixty (60)-day notice requirement and that, following EPI's logic, federal law would preempt states from adopting any time limitation on the filing of claims.

We conclude that these federal pre-emption arguments lack merit. First, EPI provides citation to no specific federal authority precluding states from adopting notification requirements. Second, the EPA approved the substantive eligibility requirements in the Board's Fund coverage scheme. Third, simple, timely, compliance with this published regulation provides "participants" with the right to recover against the Fund. For these reasons, we conclude that the federal law does not preempt the sixty (60)-day notification provision in Section 977.34.

3. *Whether the Board Erred in its Application of its Earlier Decision in In re Harrisburg Jet Center, UT04–08–025 (2005) (Harrisburg Jet Center)?*

a. The *Harrisburg Jet Center* Decision

In *Harrisburg Jet Center*, the Board adopted a recommended report of the same PO who adjudicated this case. *Harrisburg Jet Center* involved a timeliness claim, where the claimant–"participant" asserted that it only had a suspicion that a release had occurred and that it could not or did not "confirm" a release until it received the results of soil sampling tests. In *Harrisburg Jet Center*, a maintenance worker, in October 2003, noticed a small

amount of fuel on soil near a fitting of a submersible fuel pump, prompting an inspector to test the fuel line. The line failed, and further testing resulted in the discovery of a pinhole in the line. The part of the line that had the pinhole was replaced, but the line failed to hold pressure. Ultimately, based upon the inability of the line to maintain pressure, the entire line was replaced and, on the same day, a NORR was sent to DEP, which included an indication that contamination was confirmed rather than suspected.

Thereafter, an environmental company was retained to determine the effect of the leakage on subsurface conditions for the purpose of assessing whether the tank could be closed without further action or additional work. Concurrently, the line passed another test and the tank system was returned to service. The ongoing environmental testing, however, indicated shortly thereafter that the soil and groundwater was contaminated. The environmental company informed Harrisburg Jet Center that remediation was required and that Harrisburg Jet Center had six *months* from the date of discovery to submit a claim to the Fund. Harrisburg Jet Center notified the Fund of a potential claim on January 14, 2004, but the Fund denied the claim based upon information from a representative of the environmental company that the release was confirmed on November 1, 2003.

Harrisburg Jet Center contended that it did not confirm the release until it received laboratory results on November 18, 2003 (which would have made the January 14, 2004 report to the Fund timely under Section 977.34). The PO, however, determined that Harrisburg Jet Center and its contractors knew in October 2003 that a release had occurred. The PO reached this determination based in part on his view that testing for helium on October 27, 2003, at the site of the release, was posi-

tive and that, despite efforts to replace a malfunctioning part, air pressure could not be maintained in the gas line. Thus, the PO determined that laboratory testing was not necessary to confirm that a release had occurred. The PO concluded that the claim was untimely.

The PO concluded that visual observation by the initial line technician of a release was

an indication of a release from a system even if this indication itself does not establish conclusively that the system was leaking. Put another way, it was one piece of evidence available to [Harrisburg Jet Center] and its agents to be considered in the totality of available evidence confirming a release or not.

(R.R. at 248a.) Further, the PO stated that

even without conclusive evidence that the observed contamination came from a hole in the line, by the end of October the evidence overwhelmingly confirmed a release from the system. In addition to the contaminated soil [Harrisburg Jet Center] and its agents observed a hole in the line amidst corrosion ... [t]hey knew that the line did not hold pressure even after the pinhole was repaired ... In other words, a release was confirmed by the end of October.

(*Id.*) In discussing the evidence, the PO noted that

[t]he fact that [Harrisburg Jet Center] did not schedule the laboratory analysis within the seven investigatory days and before sending the [NORR] to DEP indicates that the firms did not believe the results necessary to confirm the release.... This consistent treatment of the release as confirmed corroborates the objective evidence in October 2003 which confirmed the release.

(*Id.*)

In discussing EPI's arguments relating to *Harrisburg Jet Center*, the PO in this

case stated that he was not holding EPI to a "should have known" standard and that he rejected such an approach when he decided *Harrisburg Jet Center.* The PO stated that "[t]he close of the seven day investigatory period followed by signing and submitting the [NORR] merely is additional evidence that EPI objectively had confirmed the release in November 2007. The release was confirmed on November 6, 2007 given the substantial petroleum product below the broken spill buckets." (R.R. at 359a.) The PO also rejected EPI's contention that this case is distinguishable from *Harrisburg Jet Center* based upon EPI's argument that Mr. Callahan did not have actual knowledge of the release until he received the laboratory results. The PO observed that although EPI had earlier conducted line tests to determine if a leak occurred, those tests "by their nature did not test the spill buckets which are open at the top and thus not conducive to pressure testing. The defective spill buckets, soil saturation and other information confirmed the release in November 2007 without the lab results, just as much as evidence of a leaking pressurized fluid line did for the active system in *Harrisburg Jet.* There is no material difference between the two cases." (R.R. at 360a–61a.) With this background in mind, we will address EPI's arguments relating to *Harrisburg Jet Center.*

b. Whether the Board erred in concluding that the PO correctly considered and applied the Board's decision in *Harrisburg Jet Center?*

The PO, in considering when EPI confirmed the release of the regulated substances, reasoned as follows:

> As discussed at length above, Mr. Callahan knew rather than suspected that a release had occurred at the time [of the excavation of the tanks]. While the results of the confirmatory soil samples would be helpful to determine the nature and extent of the contamination, the results were not necessary to know objectively that a release had occurred. Characterizing Mr. Callahan's state of mind after the fact as merely suspecting a release does not negate the objective evidence of his observations, actions and receipt of information in November 2007. The standard is an objective one whether a reasonable person, based upon the available evidence, confirmed that a release occurred. EPI had that evidence in November 2007 and cannot now claim that it figuratively had it head in the sand while awaiting the soil sample results.

(R.R. at 358a–59a.)

The PO reasoned that his rationale in *Harrisburg Jet Center* applied to this case as well because, as in *Harrisburg Jet Center,* EPI knew of the release before it obtained the results of the soil samples. In this case, the PO equated EPI's knowledge of "defective spill buckets, soil saturation and other information," as confirmation of the release in November 2007, notwithstanding the pending lab results, just as he viewed the evidence of a leaking pressurized fuel line in *Harrisburg Jet* as supporting his determination that the owner in that case confirmed a release before receiving the results of lab testing. Based upon the PO's factual findings, which the Board adopted, we agree with the Board's assertion that this case is not distinguishable from *Harrisburg Jet Center.*

c. Whether the rule created in *Harrisburg Jet Center* conflicts with Section 977.34?

EPI argues that the rule that the PO and Board applied in this case conflicts

with Section 977.34, because the rule applied is not based on Sections 245.304 or 245.305. EPI correctly summarizes the PO's view of Section 977.34 in *Harrisburg Jet Center* as meaning that although soil sampling is one means for a participant to investigate conditions to confirm that a release has occurred, if a participant uses other methods of investigation identified in Section 245.304, and those methods indicate that a release occurred and a participant had actual knowledge of a release, the notification period will begin to run at that point, *i.e.,* before the participant receives test results. EPI argues that this view results in "an 'imputed knowledge' standard, in essence a constructive knowledge rule, for determining the accrual date that triggers the claims reporting period." (EPI Brief at 49.) EPI asserts that the notification period created in Section 977.34, as stated in *Harrisburg Jet Center,* is triggered by actual knowledge, and not by constructive knowledge. EPI contends, however, that after the Board issued its decision in *Harrisburg Jet Center,* the Fund began to view *Harrisburg Jet Center* to mean that constructive knowledge alone will trigger the limitation period of Section 977.34, and that is what happened in this case. In this case, EPI claims that the PO erred by basing his conclusions on EPI's supposed knowledge of a *potential* claim rather than actual knowledge of contamination. EPI states that "the post-*Harrisburg Jet* 'reasonable person' test gives the Fund ... the power to decide, after the fact, when an investigation under Section 245.304 should have been completed. These are very different standards." (EPI Brief at 52–53.)

Having reviewed the PO's factual findings, we must disagree with EPI's position. The PO clearly determined that EPI had actual, not constructive, knowledge that a release occurred. The PO based this determination on communications between Mr. Callahan and PPI relating to the visual observation of substances around the spill buckets. Additionally, the PO relied upon the information EPI and PPI provided in the NORR later in November 2007, which indicated that EPI and PPI had confirmed a release. Consequently, EPI's argument that the PO applied an erroneous standard in this case is not supported by the record.

d. Whether the rule applied by the Board to determine date of confirmation constitutes de facto rulemaking and is thus invalid under the Commonwealth Documents Law?

EPI essentially argues that the Board has changed its interpretation of Section 977.34. This Court has held that "[w]hile an administrative agency may change its position regarding the proper interpretation of its rules and regulations, that agency must first explain, distinguish or overrule any of its own adverse precedent." *Gibson v. Unemployment Compensation Bd. of Review,* 682 A.2d 422, 424 (Pa. Cmwlth.1996). The PO in this case opined that *Harrisburg Jet Center* maintains the requirement that a participant have actual knowledge of a release before the notification requirement of Section 977.34 begins to run. On its face, we see no distinction between the Board's interpretation of Section 977.34 in this case and its analysis in *Harrisburg Jet Center.* Rather, the Board found significant the conclusion that, when other objective factors indicate that a participant knew of a release, then additional confirmation in the form of soil testing did not defer the running of the notification period. As we stated above, the factual findings indicate that EPI had such actual knowledge not simply of its potential claim but also of an actual release. Consequently, we reject this argument.

#### 4. Whether the Fund Should Have Accepted EPI's Claim Nunc Pro Tunc ?

EPI argues that even if we affirm the Board's conclusion that EPI's claim notification was untimely, the Board should have accepted the claim nunc pro tunc on the basis of PPI's notification to DEP in the November 2007 NORR. EPI also argues that nunc pro tunc review is appropriate because the investigation provision in Section 245.304 does not place a time limit on investigations, and, therefore, owners have no reason to believe or suspect that soil sample testing for completion of an investigation will not delay the running of the limitation period. EPI also argues that the investigative sampling required as a prerequisite to permanent tank closure creates confusion and makes an owner's assumption, that notice to DEP is sufficient for the purpose of coverage by the Fund, a reasonable excuse for delay in claim filing. Finally, EPI contends that nunc pro tunc review is appropriate here because the Board's failure to publish adjudications interpreting Section 977.34 leaves owners at a disadvantage and unaware of the legal standards that apply to Section 977.34.

■ As EPI notes, a party may appeal a lower tribunal's decision nunc pro tunc when a party demonstrates that its delay in taking action was caused by extraordinary circumstances involving fraud, a breakdown in the administrative process, or non-negligent circumstances related to the claimant, his counsel, or a third party. *C.S. v. Dep't of Pub. Welfare*, 879 A.2d 1274 (Pa.Cmwlth.2005). In response to EPI's argument, the Board asserts that because EPI has not asserted fraud, the only basis upon which the Board would be required to review an untimely claim is non-negligent conduct on the part of EPI

or a breakdown in the administrative process.

■ The Board contends that what occurred here was EPI's lack of compliance with regulatory procedures and that such action does not constitute a breakdown in the administrative process. The Board contends that the mistake here was EPI's own error in failing to notify the Fund once it confirmed the release. Further, the Board disputes EPI's characterization of the regulations as "confusing," asserting that there is nothing confusing about the claim notification provision in Section 977.34 even in light of the language of Sections 245.304 and 245.453 (the latter of which, to reiterate, relates to tank closure procedures). The Board, citing *Dwyer v. Commonwealth*, 849 A.2d 1274, 1276 (Pa. Cmwlth.2004), argues that the time limitation provision in Section 977.34 is not confusing, and, therefore, nunc pro tunc review is not appropriate in this case.

We agree with the Board that Section 977.34 is not confusing or misleading. The regulation stands for the proposition that once an owner has confirmed that a release has occurred, the owner has sixty (60) days to file a notice of a claim. In this case, the findings of fact indicate that EPI confirmed the release in November 2007 but did not file a notice of its claim until April 2008. Based upon the findings of fact which, where challenged, we have concluded are supported by substantial evidence, we agree with the Board that EPI has not demonstrated a right to nunc pro tunc review.

### III. CONCLUSION

Based upon the foregoing discussion, we conclude that the Board did not err in concluding that EPI failed to satisfy the eligibility requirement for coverage under the Act because EPI failed to notify the Fund of its claim within sixty (60) days of

confirming that a release occurred relative to three of its underground storage tanks. Accordingly, we affirm the order of the Board.

### ORDER

AND NOW, this 9th day of February, 2012, the order of the Underground Storage Tank Indemnification Board is AFFIRMED.