467 A.2d 1139

**Mark ZUBRIS, Appellant,**

v.

**PENNSYLVANIA ASSIGNED CLAIMS PLAN.**

Superior Court of Pennsylvania.

Argued Oct. 26, 1982.

Filed Oct. 7, 1983.

Reargument Denied Dec. 16, 1983.

Petition for Allowance of Appeal Denied May 24, 1984.

84

Stephen P. Ellwood, Pottsville, for appellant.

David B. Glancey, Philadelphia, for appellee.

Before HESTER, WICKERSHAM and POPOVICH, JJ.

HESTER, Judge:

This is an appeal from an Order dated March 3, 1981, dismissing a complaint in assumpsit for no-fault benefits provided under the provisions of the Pennsylvania No-Fault Motor Vehicle Insurance Act (hereinafter the "No-Fault Act") and the Pennsylvania Assigned Claims Plan. Act of July 19, 1974, P.L. 489, No. 176, 40 P.S. § 1009.101 et seq. Appellee's request for a summary judgment was granted on the grounds that the complaint was filed beyond the two-year statute of limitations provided in the No-Fault Act.

Appellant, Mark Zubris, was injured on January 13, 1976, while a passenger in an automobile operated by Michael Wallace. Mr. Wallace's vehicle was struck by another vehicle operated by Edward Stoudt. Two weeks following the accident, appellant retained counsel for the purpose of recovering compensation for his injuries.

Appellant and his attorney were advised by Mr. Wallace that his motor vehicle was covered by insurance purchased by his father from The Pflueger Agency in Schuylkill Haven, Pennsylvania. It was not until March, 1978 that appellant learned that Wallace's insurance policy covered collision only; it did not cover the liability or basic loss benefits required under the No-Fault Act.

A notice of loss was filed with appellee, the Pennsylvania Assigned Claims Plan, on August 7, 1978. This notice of loss was followed by a notice of claim filed with appellee on August 18, 1978. When the claim was rejected, appellant filed an assumpsit complaint against appellee on September

26, 1978. Appellee responded with an answer and new matter containing an allegation that the complaint was untimely filed under the No-Fault Act.

■ Section 1009.106(c)(1) of the No-Fault Act sets forth the applicable limitations period for instituting this type of action:

"If no-fault benefits have not been paid for loss arising otherwise than from death, an action therefor may be commenced not later than two years after the victim suffers the loss and either knows, or in the exercise of reasonable diligence should have known that the loss was caused by the accident, or not later than four years after the accident, whichever is earlier. If no-fault benefits have been paid for loss arising otherwise than from death, an action for further benefits, other than the survivor's benefits, by either the same or another claimant; may be commenced not later than two years after the last payment of benefits. 40 P.S. § 1009.106(c)(1).

The limitations period, at the earliest, starts to run on the date the claimant suffers a "loss". Section 1009.103 defines loss as an "accrued economic detriment resulting from injury arising out of the maintenance or use of a motor vehicle consisting of, and limited to, allowable expense, work loss, replacement services loss, and survivor's loss." Appellant avers that the "loss" was not sustained until March, 1978, when he learned that The Pfueger Agency did not provide the mandatory no-fault coverage for Mr. Wallace. Conversely, appellee maintains that loss was sustained on January 13, 1976, the date of the accident.

The primary issue presented here is whether the "loss" occurred on the accident date (January 13, 1976), on the date of actual knowledge of no no-fault coverage for Mr. Wallace (March, 1978), or some other date falling between those advanced by the parties. This issue can be resolved only after a refinement of the definition of "loss" and a determination of when "loss" occurred here.

In refining the definition of "loss", a review of recent decisions on limitations of actions under the No-Fault Act is

in order.  In *Donnelly v. DeBourke,* 280 Pa.Super. 486, 421 A.2d 826 (1980), the plaintiff was injured while riding as a passenger in a vehicle struck from behind.  A complaint in trespass for damages in excess of the threshold amounts was not filed against the negligent motorist until two years and nine months had passed from the accident date.  The defendant's preliminary objection on grounds that the statute of limitations was not complied with was sustained and the action dismissed.  In affirming, this Court rejected the plaintiff's argument that the limitations period cannot begin to run before the threshold requirements are met.  The *Donnelly* court held, in accordance with its view of tradition, that the limitations period begins to run on the date the injuries were sustained even though the nature and extent of the injuries are not yet certain.  The *Donnelly* court especially noted that the threshold limits do not preclude the *filing* of a tort cause of action;  they merely limit the *amount* of recovery.  Its concern for an unwieldly court calendar may have led the *Donnelly* court to its holding.

The *Donnelly* decision did not remain precedential for long.  This same court in *Bond v. Gallen,* 292 Pa.Super. 207, 437 A.2d 7 (1981), under identical facts, overruled the *Donnelly* decision.  In *Bond,* supra, the court viewed the No-Fault Act as a mechanism eliminating a cause of action and not merely limiting the amount of damages.  In accordance with this premise, the *Bond* court held that the limitations period does not begin to run, and the cause of action does not accrue, until the claimant knows or should have known that one of the § 1009.301(a) thresholds had been reached.  The *Bond* court recognized the discovery dangers of the threshold being reached only after many years; nevertheless, its fears were allayed when it also recognized the four-year statute of repose built into § 1009.106(c).  No action may be filed beyond four years of the accident date irrespective of the threshold remaining unsatisfied.

In further interpretation of "loss", *Myers v. U.S.A.A. Casualty Ins. Co.,* 298 Pa.Super. 366, 444 A.2d 1217 (1982),

held that the date of accident does not necessarily begin the running of the statute of limitations under the No-Fault Act; rather, the limitations period begins to run when the cause of action accrues. Two of the three plaintiffs in *Myers, supra,* were passengers in a motor vehicle operated by the third plaintiff, Lynn Wagner Myers. Miss Myers' vehicle collided with another vehicle resulting in serious physical injury to the three plaintiffs. The defendant was the insurer of the vehicle operated by Miss Myers. When the defendant insurer refused to honor a claim for medical bills, lost wages, impairment of earning capacity and loss of ability to work, the plaintiffs filed a complaint in assumpsit and trespass against the defendant. The lower court agreed with the defendant insurer's preliminary objections and ordered the complaint dismissed with prejudice for failure to file within the statutory period of limitations.

In holding that the accident date there did not begin the running of the two-year statute of limitations, the *Myers* court reasoned that the creation of a four-year statute of repose unequivocally suggests that the two-year limitations period could begin its run somewhere between the accident date and the ultimate four-year limitation from the accident date. Under the particular facts presented in *Myers, supra,* the cause of action arose from the alleged breach of the defendant's contractual obligation to pay no-fault benefits; therefore, "loss" was construed to occur at the time of breach of contract. The underlying tort cause of action was immaterial.

We recognize that, unlike the instant matter, *Bond,* supra, and *Myers,* supra, involve complaints filed against parties other than an insurance carrier assigned the claim under the assigned claims plan; nevertheless, such a factual distinction is not determinative. Both decisions refused to consider the day of the accident for the purpose of commencing the limitations period; instead, they looked solely to the date when the cause of action accrued against the respective defendants.

Prior to discussing when "loss" occurred, we must note the special statute of limitations set forth in § 1009.-106(c)(4). Section 1009.106(c)(4) provides:

Except as 'paragraph (1), (2), or (3) prescribes a longer period, an action by a claimant on an assigned claim which has been timely presented in accordance with the provisions of section 108(c) of this act may not be commenced more than sixty days after the claimant receives written notice of rejection of the claim by the restoration obligor to which it was assigned.

Section 1009.106(c)(4) incorporates, by reference, the following language set forth in § 1009.108(c)(1):

(c) Time for presenting claims under assigned claims plan.—

(1) Except as provided in paragraph (2) of this subsection, an individual authorized to obtain basic loss benefits through the assigned claims plan shall notify the assigned claims bureau of his' claim within the time that would have been allowed pursuant to section 106(c) of the act for commencing an action for basic loss benefits against any obligor, other than an assigned claims bureau, in any case in which identifiable no-fault insurance coverage was in effect and applicable to the claim.

We are mindful that appellant commenced the lower court action within sixty days following appellee's notice of rejection of benefits. As alluded to above, appellant filed his assumpsit complaint within sixty days of the filing of both his notice of loss and notice of claim with appellee. Consequently, that action was necessarily commenced within sixty days of notice of rejection of his claim. As the following discussion will indicate however, appellant failed to notify appellee within two years of date of loss, the limitations period set forth in § 1009.108(c)(1) and § 1009.106(c)(1).[1]

---

**1.** The instant matter does not fall within the parameters established by this Court's recent en banc decision in *Warren v. Reliance Insurance Company*, 318 Pa.Super. 1, 464 A.2d 487 (1983). *Warren* involved three separate cases and each plaintiff notified the Pennsylvania Assigned Claims Plan of its loss well within two years of the

Having, then, defined "loss" as the time at which the cause of action accrues, we turn to a review of the particular facts to determine when "loss" occurred here. When the cause of action accrued is determined by the intensity of appellant's efforts in discovering the extent of insurance coverage on the Wallace motor vehicle.

An evidentiary hearing was conducted on February 4, 1981 on the limitation of actions issue. It was elicited that counsel was retained by appellant in January, 1976, approximately two weeks following the accident. Upon learning from Michael Wallace that The Pflueger Agency was his insurer, appellant spent the remainder of 1976, all of 1977, and the first two months of 1978 telephoning the Agency for the precise coverage provided. In March, 1978, appellant finally learned that only collision coverage, no coverage under the No-Fault Act, was provided for Michael Wallace. Thereafter, on August 7, 1978, appellant notified the appellee of his loss and requested a personal injury protection form. He filed a claim for benefits on August 18, 1978; appellee's denial of the claim compelled appellant to institute the lower court action in September, 1978, approximately two years and eight months following the accident date. The notice of loss was filed nearly two years and seven months following the accident.

We note that the vice president of The Pflueger Agency testified that appellee's work files did not reflect any communication from appellant concerning insurance coverage until March 13, 1980; therefore, the implication follows that no reasonable diligence was exercised in an attempt to determine date of "loss". We also note, however, the vice president's admission that a record is not kept of all phone calls. Furthermore, he admitted that it was not unusual for an employee to disclose to a telephone inquirer the insurance coverage of a particular insured without creating a record.

accident date. Therefore, the sixty-day limitations period in § 1009.-106(c)(4) was properly at issue.

■ The granting of preliminary objections for the dismissal of a complaint will be sustained on appeal only where the pre-trial hearing results in a clear and unequivocal portrayal of facts justifying a denial of the claim. *Allstate Ins. Co. v. Fioravanti*, 451 Pa. 108, 299 A.2d 585 (1973); *Legman v. Scranton School District*, 432 Pa. 342, 247 A.2d 566 (1968). The facts extracted below unambiguously reflect appellant's failure to meet his burden of proof, a burden properly imposed upon him since he was denying that he knew or had reason to know that "loss" occurred prior to March, 1978. See *O'Neill v. Metropolitan Life Ins. Co.*, 345 Pa. 232, 26 A.2d 898 (1942); *Hillman Transp. Co. v. Home Ins. Co. of New York*, 268 Pa. 547, 112 A. 108 (1920).

In light of the vice president's admissions, we conclude that appellant did make several phone calls from the accident date through March, 1978 in an attempt to discover the extent of Michael Wallace's coverage; however, these inquiries do not, without evidence to the contrary, amount to reasonable diligence. A twenty-six month period of nothing more than telephone calls is not a demonstration of intense effort. Investigation of insurance coverage by letter and personal visits to the insurer or by perusal of the actual policy would constitute "reasonable diligence". The record does not indicate whether appellant performed any of these.

■ The notice of loss was filed on August 7, 1978; consequently, the cause of action must have accrued, i.e., the "loss" occurred, no earlier than August 7, 1976. In light of the accident date of January 13, 1976, we must decide whether a seven-month period (January 13, 1976 through August 7, 1976) was enough time for appellant to actually know or be charged with the knowledge of knowing that "loss" occurred. Such a determination does not depend entirely upon appellant's actions. It similarly depends upon the representations of The Pflueger Agency when responding to appellant's request for information relating to precise insurance coverage and whether appellant reasonably relied upon such representations. It de-

pends also upon appellee's insurer's representations and whether appellant reasonably relied upon them as well. The record is devoid of such evidence; appellant offers no substantive justification for his rather meager efforts to discover the extent of insurance coverage. We find, therefore, that appellant could have discovered, through the exercise of reasonable diligence, the absence of no-fault insurance benefits before August 7, 1976; consequently, the filing of his notice of claim on August 7, 1978, was untimely.

■ Although it discussed the limitation of action issue, the lower court opined and appellee avers that any issues raised by appellant on appeal were waived due to his failure to file exceptions under Rule 1038 of the Pa.R.C.P. We disagree. Rule 1038 requires the filing of exceptions within 10 days after notice of the decision in a non jury trial. Rule 1038 does not extend the requirement for exceptions to orders dismissing a complaint following a pre-trial hearing on a motion for summary judgment.

Order affirmed.

WICKERSHAM and POPOVICH, JJ., filed concurring opinions.

WICKERSHAM, Judge, concurring:

I concur in the result reached by the majority. I too would affirm the judgment entered by the Honorable Joseph F. McClosky of the court below dismissing plaintiff Zubris's complaint. I do not concur in the reasoning adopted by the majority.

On January 13, 1976 appellant Mark Zubris was injured while riding as passenger in an automobile operated by one Michael Wallace. As a result of the accident Zubris sustained loss as defined in the Pennsylvania No-fault Motor Vehicle Insurance Act[1] including work loss and various allowable expenses. Subsequent to the accident Zubris

1. Act of July 19, 1974, P.L. 489; No. 176, §§ 101 *et seq.*, 40 P.S. §§ 1009.101 *et seq.*

learned that the Wallace vehicle was insured only for collision loss.

As "an individual authorized to obtain basic loss benefits through the assigned claims plan" Zubris notified the assigned claims bureau on August 7, 1978, more than two and one half years following the date of the accident.

Section 108(c)(1) entitled: "Time for presenting claims under assigned claims plan" reads as follows:

> (1) Except as provided in paragraph (2) of this subsection, an individual authorized to obtain basic loss benefits through the assigned claims plan shall notify the assigned claims bureau of his claim within the time that would have been allowed pursuant to section 106(c) of this act for commencing an action for basic loss benefits against any obligor, other than an assigned claims bureau, in any case in which identifiable no-fault insurance coverage was in effect and applicable to the claim.

40 P.S. § 1009.108(c)(1).

Section 106(c)(1) referred to hereinabove provides as follows:

> If no-fault benefits have not been paid for loss arising otherwise than from death, an action therefor may be commenced not later than two years after the victim suffers the loss and either knows, or in the exercise of reasonable diligence should have known, that the loss was caused by the accident, or not later than four years after the accident, whichever is earlier.

40 P.S. § 1009.106(c)(1).

Taken together, notification to the assigned claims bureau by an individual authorized to obtain basic loss benefits through the assigned claims plan must be given in all events no later than four years after the accident, nor later than two years after the victim suffers the loss and either knows, or in the exercise of reasonable diligence should have known, that the loss was caused by the accident. Instantly, Zubris sustained personal injuries on the date of

the accident, January 13, 1976, and began from that date accruing allowable expenses and work loss.[2]

> 'Loss' means accrued economic detriment resulting from injury arising out of the maintenance or use of a motor vehicle consisting of, and limited to, allowable expense, work loss, replacement services loss, and survivor's loss.

40 P.S. § 1009.103.

Under the foregoing circumstances Zubris had to notify the assigned claims bureau within two years after suffering loss, which loss in the case *sub judice* coincided with the date of the accident.[3]

POPOVICH, Judge, concurring:

I concur in Judge Hester's affirmance of the lower court's Order, but write separately to amplify on the question of whether appellant "actually kn[e]w or [could] be charged with the knowledge of knowing [when] the[e] 'loss' occurred." (at 1143).

The record indicates that on February 4, 1981 an evidentiary hearing was conducted for the specific purpose of determining if and when the appellant was in possession of sufficient information to place him on notice that a "loss" had occurred, so as to trigger the running of the two-year

---

**2.** Zubris testified that he was taken from the scene of the accident to a hospital and immediately began accruing loss. Reproduced Record at 34–42.

**3.** In *Bond v. Gallen,* 292 Pa.Super. 207, 437 A.2d 7 (1981) we considered the statute of limitations where an injured victim sued a third party tortfeasor; in *Myers v. USAA Casualty Insurance Co.,* 298 Pa.Super. 366, 444 A.2d 1217 (1982), we considered the statute of limitations where an injured victim sued his own no-fault carrier; in *Williams v. Keystone Insurance Co.,* 302 Pa.Super. 44, 448 A.2d 86 (1982), we considered the statute of limitations where an injured victim timely notified the assigned claims bureau, was assigned a participating insurer and thereafter sued that insurer. In *Platts v. Government Employees Insurance Co.,* 301 Pa.Super. 379, 447 A.2d 1017 (1982), we considered the statute of limitations where an injured victim received no-fault benefits from her own insurance company and later brought suit against such company to recover further benefits.

statute of limitations under Pennsylvania's No-Fault Motor Vehicle Insurance Act.[1] 40 P.S. § 1009.106(c)(1).

Before examining what transpired at the February 4 hearing, it is necessary to set forth, initially, which party to the litigation had the burden of proof.

In civil cases, the burden of proof rests upon the party who asserts the affirmative of an issue. Also, if a negation or negative affirmation be so essential, the proof of such a negative lies on the party so affirming it. *United States v. Gypsum Co. v. Birdsboro Steel Foundry & Machine Co.,* 160 Pa.Super. 548, 52 A.2d 344 (1947). In other words, one alleging a fact which is denied has the burden of establishing it. *O'Neill v. Metropolitan Life Insurance Co.,* 345 Pa. 232, 26 A.2d 898 (1942); *Hillman Transp. Co. v. Home Ins. Co. of New York,* 268 Pa. 547, 112 A. 108 (1920).

Conversely, the phrase "burden of going forward with the evidence" is generally used to designate the obligation resting upon a party to meet with evidence a prima facie case created against him by the party who has the burden of proof. *See Henes v. McGovern,* 317 Pa. 302, 309–311, 176 A. 503 (1935). Although the burden of producing evidence may shift, the burden of proof, in the sense of establishing the truth of a given proposition or issue, never shifts during the course of the trial. *Henes v. McGovern, supra;* Kleiner, Jack and Rome, Edwin P., Trial Handbook for Pennsylvania Lawyers, § 81 (1980).

Thus, the burden of proof in the strict sense of the term, that is, the ultimate burden of establishing the truth of a given proposition of fact essential to a cause of action or defense, " 'rests upon the party who as determined by the pleadings or the nature of the case asserts the affirmative of an issue, * * *. One alleging a fact which is denied has the burden of establishing it. * * * The affirmative of an issue, as thus used, includes any negative proposition which the person asserting the affirmative may have to show.' "

---

**1.** In particular, the hearing was "limited to the question of the timeliness of the suit which was brought [by the plaintiff-appellant Mark Zubris] against the Pennsylvania Assigned Claims Plan." (RR. 23)

(Citations omitted) *O'Neill v. Metropolitan Life Insurance Co., supra,* 345 Pa. at 237–239, 26 A.2d at 902.

Instantly, an examination of the pleadings [2] evidences that appellant denied having knowledge or reason to know that he had incurred a "loss" compensable under the No-Fault Motor Vehicle Insurance Act until January or February of 1978, as compared to the date of the accident on January 13, 1976, for which he was attempting to recover "work-loss" benefits. On the other hand, the appellee averred that appellant's claim was barred by the No-Fault Motor Vehicle Insurance Act's two-year statute of limitations, inasmuch as the notice of a claim was filed more than two years after the appellant knew or had reason to know that he had sustained a "loss" as a result of the accident on January 13, 1976.

Therefore, we have a situation in which the party plaintiff asserted a "negative affirmation," i.e., that he was unaware until some two years after the accident that the driver of the vehicle in which he was injured had only collision insurance and no coverage for "payment of basic loss benefits pursuant to the Pennsylvania No-Fault Motor Vehicle Insurance Act, 40 P.S. § 1009.101, *et seq.*" (Appellant's "Answer To Motion For Summary Judgment Or Partial Summary Judgment," Point 1)  Consequently, as stated earlier, the party, which is the appellant here, asserting a "negative affirmation," has the burden of proving such a negative. *See O'Neill v. Metropolitan Life Insurance Co., supra; United States Gypsum Co. v. Birdsboro Steel Foundry & Machine Co., supra.*  As a result, at the February 4 evidentiary hearing to resolve the statute of limitations question, appellant had the burden of proving that he lacked sufficient information to cause the two-year statute of limitations to commence running prior to January or February of 1978—this is the time-frame within which appellant discovered that the driver's insurance carrier (The

2. ˙ *See, e.g.,* "Complaint," "Answer of Defendant Pennsylvania Assigned Claims Plan," appellee's "Motion For Summary Judgment or Partial Summary Judgment" and "Plaintiff's Answer to Motion For Summary Judgment or Partial Summary Judgment."

Pflueger Agency), from which he anticipated the recoupment of his "work loss benefits and allowable (medical) expense benefits" (*see* appellant's "Complaint," Point 7), did not provide such coverage to the insured. Inextricably tied to the resolution of this question, given the particular facts here, is the determination of whether appellant failed to act with reasonable diligence in ascertaining the identity of the no-fault insurance carrier of the driver *and the extent of coverage provided for under the policy of insurance.*

I note with particular interest the following statement by appellant's hearing counsel, who was different from counsel initially hired by appellant, as reflective of the fact that counsel was acutely aware of his burden of proof at the proceeding:

> *"Our position is this, that the statute in this instance does not begin to run against Mr. Zubris until the time when he knew or reasonable [sic] should have known, either himself or through his counsel, that the person in whose automobile he was riding did not have the no-fault insurance, the PIP benefits which it is assumed all drivers in Pennsylvania carry pursuant to the state statute.* And that's ... For purposes of this hearing I have Mr. Zubris here just to testify ...
>
> My offer of proof is this, Judge: ... [Mr. Zubris] believed, I think you would hear, that Mr. Wallace[—the driver of the vehicle in which Mr. Zubris was a passenger—] had the appropriate insurance, and he, Mr. Zubris, consulted Mr. Krasno [—the attorney first hired by Mr. Zubris—], as did Mr. Wallace subsequently, as a result of this accident, and Mr. Krasno would then testify as to his efforts concerning the determination whether there was insurance. And he would testify as to his contact with the Pflueger Agency. And it is our position for this case that not having been told until early 1978, January or February of '78, that there was no no-fault insurance, so far as Mr. Wallace was concerned, the claim against the Pennsylvania Assigned Claim Plan begin [sic] to run at that moment in time, because of the Assigned Claims

Plan's function as a fall-back insurer for someone who does not have insurance.

\*   \*   \*   \*   \*   \*

Under the law of Pennsylvania we're all supposed to have insurance in order to operate an automobile. One kind of insurance we're supposed to have is no-fault insurance, and, therefore, *it seems to me that a person, be he lawyer or layman, is entitled to rely upon a driver's compliance with the law; that is that the driver will have insurance.* And it's only when you know or reasonably should have known that that person is not complying with the law; that is, does not have insurance, that the statute then begins to run as against this fall-back insurer, this reserve, if you will, which is denominated the Pennsylvania Assigned Claims Plan. That's the legal thesis I'm operating on in this case." (Emphasis added) (RR. 8–10)

Having set forth some of the procedural matters relevant to the case at bar and appellant's counsel's awareness of his particular burden of proof, we can now turn to the evidentiary hearing to decide if appellant, in fact, met his burden.

The witnesses presented by counsel in his effort to establish when Mr. Zubris or original counsel "knew or reasonabl[y] should have known ... that the person in whose automobile [appellant] was riding did not have the no-fault insurance," consisted of Mr. Zubris, prior counsel (Mr. Krasno) and the vice-president of the driver's insurance company (Mr. Gosch).

At the hearing, Mr. Zubris testified that after the accident he hired Attorney Krasno "around in January" of 1976. Shortly thereafter, the attorney had the appellant and the driver (Mr. Wallace) of the vehicle meet in his office to discuss the case. At this time, according to appellant, Mr. Wallace "said that he had insurance." (RR. 36) Albeit appellant had no sound basis for believing that Mr. Wallace had complete insurance coverage, nevertheless, the preceding statement led appellant to "figure[ ] that he had it [—i.e., insurance to pay appellant's medical bills]." *Ibid.*

Additionally, appellant made reference to the fact that he did not find it unusual that a year had elapsed and his hospital bills had yet to be paid by the driver's insurance company.

Attorney Krasno's version confirmed Zubris' accounting that he was hired in late January of 1976, and, concerning the meeting with Mr. Wallace, the witness remarked, "He indicated to me that he had full insurance coverage." (RR. 43)  However, Krasno qualified his testimony by stating that Mr. Wallace was *not* asked "whether he had collision and liability and PIP ...." *Ibid.*  Next, we see that when appellant's hearing counsel asked Attorney Krasno, "Please tell Judge McCloskey what you did and as best you're able to tell us about when you did it?"  the witness answered:

"There were a number of telephone calls through, well, the beginning of 1976, I don't recall the exact date, to the Pflueger Agency.  I advised him that I represented Mr. Wallace and Mr. Zubris, that Mr. Zubris, apparently, did not have insurance and he would need to know the nature of the insurance held by Mr. Wallace.  On each occasion, until sometime in early 1978, I was told, 'Yes, Mr. Wallace has insurance with us, we're not sure of the nature of it, we'll have to get it together for you and let you know what kind of insurance he has.'"  (RR. 43–44)

Despite Krasno's representation of *both the claimant and the insured,* he failed to ascertain that Mr. Wallace did not have complete no-fault insurance until "about March of 1978," some two years *after* the accident. (RR. 45)  The reasons given by Attorney Krasno for not securing such information sooner than he did was because he "relied on both the [Pfleuger Agency's] representations and the representations of Mr. Wallace [ ]" concerning the scope of the insurance coverage.

On cross-examination, Attorney Krasno reaffirmed the point that he had placed, personally, a series of phone calls to The Pflueger Agency and that on "more than one" occasion he had conversed with Mr. Wallace concerning the insurance in question.  Notwithstanding the aforesaid,

Krasno nowhere makes reference to any attempt on his part to secure either a copy of Wallace's insurance policy or personally visiting the insurance agency to expedite the determination as to the exact nature and scope of Wallace's insurance coverage. Rather, *according to Attorney Krasno's own version of what happened, his* efforts to resolve the issue consisted of no more than conversing with Mr. Wallace and phoning the insurance agency on several occasions over the course of two years. This course of (in)action seems ill-advised in light of Krasno's admission that he "d[idn't] think Mr. Wallace understood his policy at anytime." (RR. 52) Based on the course of events just recited, it is not unusual to find Attorney Krasno testifying that he was "surprised" to learn from The Pflueger Agency in March of 1978, which was after the two-year statute of limitations had run, that Mr. Wallace's insurance did not encompass appellant's claim for benefits.

The testimony of the insurance agency's vice-president, Mr. Gosch, indicates that, as a regular course of business, records are made at the agency at about the same time as the incident they reflect. However, save for incoming and outgoing long distance calls, it was not the agency's practice to document *every* phone call coming into the office. Therefore, the agency's records (i.e., Mr. Wallace's file folder produced at the hearing) did not reveal "any communications from Mr. Krasno with respect to the insurance coverage of Mr. Wallace[ ]" until March 13, 1980. (RR. 56 & 57) At that time, Mr. Gosch sent a letter to Attorney Krasno, in response to two phone calls he had with Krasno during the preceding week, telling "him about Mr. Wallace and his insurance coverage." (RR. 57) In other words, the agency had no record of "Mr. Krasno's telephone calls in 1976 or '77 concerning whether Michael Wallace was an insured[.]" (RR. 59)

At the completion of Mr. Gosch's testimony, the hearing was concluded.

Based on the aforementioned, I find that the court below was presented with sufficient evidence to grant appellee's motion for summary judgment. *See* Pa.R.Civ.P. 1035.

I hasten to point out that I agree with Judge Hester that Krasno's phone inquiries over the course of two years comes nowhere near to satisfying the "reasonable diligence standard," thus we need not remand the instant case for the purpose of supplementing the record regarding what statements were made, if any, to Krasno by the agency's employees and how he might have relied upon them to his detriment. As correctly noted by Judge Hester, the record is barren on this subject. However, it cannot be gainsaid that the presence of this void in the record is attributable to *appellant's failure to satisfy his burden of proof; a burden which did not shift during the course of the February 4 hearing. See O'Neill v. Metropolitan Life Insurance Co., supra;* Kleiner, Jack and Rome, Edwin P., Trial Handbook for Pennsylvania Lawyers, § 81 (1980). Thus, I am in accord with the ruling which will preclude, in effect, the appellant from having a "second chance" to prove his case. *See Commonwealth v. Goldwire*, 313 Pa. Super. 273, 278 n. 5, 459 A.2d 1225, 1228 n. 5 (1983).

Stated differently, since the record is sufficient to sustain the lower court's ruling, I see no need to remand. This is not a case in which "[w]ithout such evidence there is no way the lower court could have determined" the extent of Wallace's insurance coverage. *Compare Commonwealth ex rel. Novack v. Novack*, 310 Pa.Super. 112, 117, 456 A.2d 208, 211 (1983). Quite the contrary, the record is supportive of the conclusion that appellant was lax in his efforts to resolve the insurance coverage question and fell prey to the two-year statute of limitations of Pennsylvania's No-Fault Motor Vehicle Insurance Act.

Therefore, based on the aforesaid, I find no reason to take issue with this Court's affirmance of the lower court's Order.