## PORTER TOWNSHIP INITIATIVE

v.

## EAST STROUDSBURG AREA SCHOOL DISTRICT and Wallenpaupack Area School District.

### Appeal of: East Stroudsburg Area School District.

Commonwealth Court of Pennsylvania.

Argued March 13, 2012.

Decided April 30, 2012.

Reargument Denied June 28, 2012.

Christopher S. Brown, Stroudsburg, for appellant.

Anthony J. Magnotta, Hawley, for appellee Porter Township Initiative.

Raymond A. Waldron, III, Hawley, for appellee Wallenpaupack Area School District.

---

1. Act of March 10, 1949, P.L. 30, added by Section 1 of the Act of June 23, 1965, P.L. 139, *as amended.*

2. The full text of Section 242.1 provides:

(a) A majority of the taxable inhabitants of any contiguous territory in any school

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and LEADBETTER, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge COHN JUBELIRER.

East Stroudsburg Area School District (ESASD) appeals from the Order of the Court of Common Pleas of Pike County (trial court), which set forth the formulas for calculating, pursuant to Section 242.1 of the Public School Code of 1949 (School Code), 24 P.S. § 2–242.1,[1] the amount of indebtedness and obligations the Wallenpaupack Area School District (WASD) owes to ESASD in this matter if and when Porter Township, a territory in ESASD, is transferred to WASD. On appeal, ESASD argues that the trial court erred because: (1) its finding that ESASD would lose $1.8 million in revenue from the transfer is not supported by substantial evidence; (2) the formula used to determine the payment from WASD for ESASD's long term contracts and other obligations erroneously relies upon the number of Porter Township students in ESASD, rather than on the assessed value of those contracts and obligations; and (3) WASD should be required to pay a prorated share of ESASD's total indebtedness, rather than a prorated share of the "Local Effort Requirements" of ESASD's indebtedness.

Pursuant to Section 242.1 of the School Code[2] taxpayers in Porter Township, rep-

district or school districts, as herein established, may present their petition to the court of common pleas of the county in which each contiguous territory, or a greater part thereof, is situated, asking that the territory be established as an independent district for the sole purpose of transfer to

resented by the Porter Township Initiative (PTI), petitioned to create an independent school district such that Porter Township could be transferred from ESASD to WASD (Petition). In the first of the four step process to transfer a territory from one school district to a different school district, the trial court made a determination that PTI had satisfied all of the statutory requirements for making such Petition. In the second step, the Secretary of Education reviewed the Petition and determined that the transfer was appropriate from an educational standpoint. In the third step, the matter returned to the trial court to:

> determine the amount, if any, of the indebtedness and obligations of the

school district, from whose territory such independent district is taken [ [ (ESASD) ], that said district [ (WASD) ] shall assume and pay, and, a statement prorating the State subsidies between or among the losing district [ (ESASD) ] ... and the receiving district [ (WASD) ].

24 P.S. § 2–242.1.[3] The trial court, acting in equity, held a hearing, at which ESASD, WASD, and PTI presented evidence to determine the amount WASD would have to pay ESASD as a consequence of the transfer, if approved.

The parties presented a Stipulation and Agreement (Stipulation) in which they set forth what they did and did not agree to

> an adjacent school district contiguous thereto. Where the territory described in any such petition is to be taken from two or more school districts, such petition shall be signed by a majority of all the taxable inhabitants of the part of each school district which is to be included in such independent district for transfer. Such petitions shall set forth a proper description of the boundaries of the territory to be included in such proposed independent district, and the reasons of the petitioners for requesting such transfer to another school district and the name of the district into which its territory is proposed to be placed.
>
> The court shall hold [a] hearing thereon, of which hearing the school district or districts out of whose territory such proposed independent district is to be taken and the school district into which the territory is proposed to be assigned, shall each have ten days notice. In all cases where an independent district is proposed for transfer from one school district to another, the merits of the petition for its creation, from an educational standpoint, shall be passed upon by the Superintendent of Public Instruction and the petition shall not be granted by the court unless approved by him. The court of common pleas shall secure the reaction from the Superintendent of Public Instruction upon receipt of the petition properly filed.
>
> The court, in its decree establishing such independent district for transfer purposes,

> shall also determine the amount, if any, of the indebtedness and obligations of the school district, from whose territory such independent district is taken, that said district shall assume and pay, and, a statement prorating the State subsidies payable between or among the losing district or districts and the receiving district.
>
> In all cases where such proceedings result in the creation and transfer, by decree of the court, of an independent district, the cost and office fees shall be paid by the petitioners or, otherwise, by the receiving district. Such independent districts created under the provisions of this act shall not become an operating school district but will be created for transfer of territory only.
>
> (b) In the case of independent districts established hereafter, the court of common pleas shall notify the county board of school directors regarding receipt of [the] petition for such establishment and shall direct said board to prepare a statement of acceptance or rejection of the proposed placement of the district in the designated administrative unit of the county plan; such statement to be transmitted to the court and to the State Board of Education.
>
> 24 P.S. § 2–242.1.

3. The fourth and final step is for the State Board of Education (State Board) to approve and order the transfer. 24 P.S. § 2–242.1(b).

regarding any payment from WASD to ESASD. They agreed that the proper method to calculate WASD's payment to ESASD for "indebtedness" would be to divide the total assessed value [4] of Porter Township by the total assessed value of ESASD, including Porter Township. (Stipulation ¶ 8, R.R. at 2a.) However, they could not agree as to whether the amount of bond indebtedness to which the assessed value ratio would be applied should be the "Debt Service Requirements," which reflects ESASD's total bond indebtedness, or the "Local Effort Requirements," which reflects an offset of the total indebtedness from a subsidy ESASD receives from the Commonwealth of Pennsylvania (Commonwealth) for its buildings. (Stipulation ¶ 14(a), R.R. at 3a–4a.) Additionally, they disagreed as to whether the "other obligations," long term contracts for equipment and services, for which ESASD believed it was entitled payment required reimbursement based on the assessed value of those contracts, as agreed to for bond indebtedness, or on a prorated scale based on the number of Porter Township students divided by the total number of ESASD students.[5] (Stipulation ¶¶ 14(b)–14(c), R.R. at 4a.) Finally, the parties disagreed whether the payment should be in a lump sum or annual pro-rata payments until ESASD could refinance its bond debt.[6] (Stipulation ¶ 14(d), R.R. at 4a.)

ESASD presented the testimony of, *inter alia*, Patricia Bader, its Business Manager, who explained the tax revenue Porter Township generates for ESASD from various taxing mechanisms. Ms. Bader testified that ESASD would lose $2,251,329.00 in revenue from the transfer and that ESASD would not realize any savings as a consequence of the transfer because the change in student enrollment would not support a decrease in staffing, building, class size, transportation, equipment, or supplies. With regard to the question of whether the appropriate total indebtedness figure should be the "Local Effort Requirements" or the "Debt Service Requirements," Ms. Bader testified that the latter figure reflects the deduction from total bond indebtedness of state subsidies for capital assets and that ESASD receives the same subsidy regardless of whether ESASD has paid cash for such an asset or incurred specific debt for the asset. On cross-examination, WASD asked Ms. Bader why ESASD would need WASD's payment to reflect the indebtedness not reduced by the state subsidy when ESASD would receive the same amount whether it held debt for a building or not, and Ms. Bader indicated that the subsidy component was called a "rental reimbursement subsidy," and that WASD should not be entitled to a credit for that subsidy because ESASD maintained and built the buildings. (Hr'g Tr. at 48, R.R. at 57a.) On the issue of what formula

---

4. The Stipulation defined total assessed value to mean the most recent assessed value as determined by the State Tax Equalization Board for both Porter Township and ESASD, effective the first day of the fiscal year immediately following the approval of the transfer by the State Board. The districts agreed that, based on the present figures, the percentage resulting from that calculation is 2.576%. (Stipulation ¶¶ 8–9, R.R. at 2a–3a.)

5. Porter Township only has 34 students enrolled in ESASD, while the total student population of ESASD is a little over 8,000. The parties do not dispute that the percentage of Porter Township students is 0.41% of ESASD total student population. (Stipulation ¶ 14(c), R.R. at 4a.)

6. The parties also agreed that the determination of state subsidy amounts is a matter for the Department of Education (Department). (Stipulation ¶ 12, R.R. at 3a.)

should be used to calculate WASD's share of ESASD's long term obligations, Ms. Bader stated that ESASD entered into the long term contracts "with the knowledge that the Porter Township accumulations revenues would be included for our use and we entered into these contracts knowing that we had that funding." (Hr'g Tr. at 33, R.R. at 42a.) She further stated that ESASD cannot adjust the terms of those long term contracts until the expiration of those contracts. However, on cross-examination she acknowledged that, at least in some contracts ESASD has staggered the contracts and tries "to replace them[, computers,] based on the level of students so that the high schools are replaced at the same time[,] the intermediates are replaced[,] and the elementary is a little more flexible" and that it is possible to take into account drops in enrollment in deciding to buy the next time ESASD enters into a lease for computers. (Hr'g Tr. at 51–52, R.R. at 60a–61a.) She further agreed with the statement that

> it [is] obvious that the number of students you have is a factor in deciding the extent of these [long term] contracts in terms of [the] number of computers you would need and how much staff you would need and things like that [ ], but it is also the case that revenue is a factor in deciding how much to spend on these [long term] contracts[.]

(Hr'g Tr. at 68, R.R. at 77a (emphasis added).) Ms. Bader also explained that one of the reasons the districts chose the date for calculating the amount due from WASD was because that date is "when our budget process starts for the next year, so if we had that date, then we would begin doing what we had to do" with regard to adjusting the levels of teachers. (Hr'g Tr. at 53–54, R.R. at 62a–63a.) Ms. Bader also testified regarding the reasons for both districts' views on the timing of payment from WASD to ESASD, indicating

that ESASD did not want a pro-rata payment pending refinancing/refunding because of the uncertainty regarding rates for refinancing that would be available at such time. (Hr'g Tr. at 28–33, 39–45, 53–54, 60–61, 68, R.R. at 37a–42a, 48a–54a, 62a–63a, 69a–70a, 77a.)

WASD's financial expert, Les Bear, testified regarding the difference between the "Local Effort Requirements" and "Debt Service Requirements," referring, without objection, to a conversation he had with Barbara Nelson, Director of Budget and Fiscal Management at the Department of Education (Department). Like Ms. Bader, Mr. Bear testified that, notwithstanding the transfer of Porter Township, ESASD would continue to receive the same subsidy from the Commonwealth because those subsidies are related to ESASD's buildings that were constructed using bond money and should be assessed at the pro-rated rate. With regard to the long term contracts and other obligations, Mr. Bear stated that he discussed the matter with Ms. Nelson, who informed him that the items related to computer leases, internet service, etc. were "more related to students." (Hr'g Tr. at 93, R.R. at 102a.) ESASD objected on hearsay grounds, noting that it did not object to relying on Ms. Nelson's other statements because she told its financial advisor the same thing but that ESASD did not ask Ms. Nelson about the long term contracts and obligations. The trial court overruled the objection, stating that it would allow Mr. Bear's testimony "with the understanding that like most of what we [are] dealing with here it's kind of up in the air and not necessarily nailed down to any rules or regulations." (Hr'g Tr. at 93–94, R.R. at 102a–03a.) Accordingly, Mr. Bear opined that, if WASD had to make any payments for the long term contracts and obligations, those payments should be based on a per student ratio.

Finally, Mr. Bear explained why making a lump sum payment would be detrimental to WASD and would require WASD to obtain judicial approval to borrow money in order to pay ESASD in one lump sum. (Hr'g Tr. at 92–98, 101, R.R. at 101a–07a, 110a.)

WASD also offered the testimony of KerriAnn Horan, its Business Manager. Ms. Horan testified, in relevant part, that it is possible to make adjustments to long term contracts and obligations to account for lower student enrollment.[7] (Hr'g Tr. at 84–85, 88–90, R.R. at 93a–94a, 97a–99a.)

Following the hearing, the trial court concluded that the revenue lost to ESASD from the transfer of Porter Township, minus the cost of educating Porter Township students, would be $1.8 million. The trial court agreed with WASD and PTI that, in calculating the long term contracts and other obligations, the proper formula to use is to determine the percentage of those contracts/obligations that were attributable to Porter Township students and require WASD to pay that amount, i.e., per student ratio. Thus, when the transfer occurs, WASD's prorated share of those contracts and obligations would be based on the number of Porter Township students divided by the total number of ESASD students, including Porter Township students. The trial court provided an example, using the numbers applicable at the time of the hearing to calculate what WASD would owe if the transfer were to occur at that time, noting that the number of Porter Township students represented .41% of the total ESASD students. Accordingly, the trial court took the value of ESASD's long term contracts and obligations, $218,306,662.00, and multiplied it

by .41% for a total of $895,056.00. (Trial Ct. Op. at 4 n. 2.)

■ The trial court then held that the appropriate formula to use to calculate ESASD's total indebtedness was the "Local Effort Requirements" approach, which calculated ESASD's indebtedness by excluding the amount of reimbursements the Commonwealth would provide over the term of ESASD's debt payments, for a total indebtedness, at the time of the hearing, of $305,162,963.00. Noting that the reimbursements by the Commonwealth would not be adversely affected by the transfer, the trial court concluded that using the "Local Effort Requirements" formula was more appropriate. To calculate the amount of this indebtedness WASD would pay to ESASD, the trial court indicated that this amount should be multiplied by the most recent State Tax Equalization Board (STEB) assessed value for both Porter Township and ESASD that is in effect as of the first day of the fiscal year following approval of the transfer by the State Board of Education (State Board). The trial court then, as an example, calculated the amount WASD would owe if the transfer had been approved as of the date of the hearing, using the total indebtedness of $305,162,963.00 multiplied by the STEB formula, 2.576%, for a total of $7,860,997.00. The trial court then concluded that the total WASD would owe ESASD would be determined by adding the prorated indebtedness and long term contracts and obligations, in its example $7,860,997.00 and $895,056.00, the total of which WASD would have to pay ESASD in eight equal annual installments of approximately $1.1 million "payable on the first day of October beginning on October 1

---

7. PTI presented the testimony of its President, Bruce Johnson, for the purpose of establishing his qualifications to act as the Director of the Independent School District. PTI ques-
tioned ESASD's and WASD's witnesses, but did not present its own witnesses on the financial issues involved in this matter.

immediately following transfer of Porter Township from [ESASD] to [WASD]." (Trial Ct. Op. at 4–5, 7.) Finally the trial court concluded that there would be no interest added to the eight payments since the debt figures stipulated to already include the cost of the debt. (Trial Ct. Op. at 8.) ESASD now appeals to this Court.[8]

 Before we address ESASD's arguments on appeal, we note that there is an unresolved issue regarding the burden of proof at this stage of a school transfer proceeding. (Hr'g Tr. at 109–12, R.R. at 118a–21a.) Although the petitioner seeking the creation of the independent school district carries the burden in the initial stages, as the trial court pointed out, the ultimate impact of a decision regarding the debt and obligations would be felt by WASD and ESASD, not PTI. (Hr'g Tr. at 109–10, R.R. at 118a–19a.) Moreover, as noted by counsel for PTI, all of "the information that is necessary in order to make that decision[, i.e., how much the receiving school should pay the losing school,] is, in fact, outside the scope of [PTI's] responsibility and the scope of the independent [school] district." (Hr'g Tr. at 111–12, R.R. at 120a–21a.) Ultimately, the trial court did not expressly rule on this legal issue, presumably leaving it for this Court to determine which of the parties, the petitioner, the receiving school district, or the losing school district, bears the burden of proof at this stage of the proceedings.

 We first look to the language of the relevant paragraph in Section 242.1, which provides:

The court, in its decree establishing such independent district for transfer purposes, shall also determine *the amount, if any, of the indebtedness and obligations of the school district, from whose territory such independent district is taken,* that said district shall assume and pay, and, a statement prorating the State subsidies payable between or among the losing district or districts and the receiving district.

24 P.S. § 2–242.1 (emphasis added). Although this language appears to be silent as to who bears the burden of proof at this stage, our Supreme Court recently discussed burdens of proof in *500 James Hance Court v. Pennsylvania Prevailing Wage Appeals Board,* —— Pa. ——, 33 A.3d 555 (2011), stating:

Long ago, this Court adopted the following perspective on the point:

In every lawsuit, somebody must go on with it; the plaintiff is the first to begin, and if he does nothing he fails. If he makes a prima facie case, and nothing is done by the other side to answer it, the defendant fails. The test, therefore, as to the burden of proof is simply to consider which party would be successful if no evidence at all was given, or if no more evidence was given than is given at this particular point of the case; because it is obvious that during the controversy in the litigation there are points at which the onus of proof shifts, and at which the tribunal must say, if the case stopped there, that it must be decided a particular way.... Now that being so, the question as to onus

---

8. Given the language in Section 242.1 of the School Code, which refers to a trial court's "decree," 24 P.S. § 2–242.1, defined as "a judicial decision in a court of equity," Black's Law Dictionary 471 (9th ed.2009), the trial court acted, at least in part, as a court in equity. This Court's standard of review of a trial court's order addressing "a request for equitable relief is limited to considering whether the trial court erred as a matter of law or abused its discretion." *Woodward Township v. Zerbe,* 6 A.3d 651, 657 n. 6 (Pa. Cmwlth.2010).

of proof is only a rule for deciding on whom the obligation rests of going further, if he wishes to win. *Henes v. McGovern*, 317 Pa. 302, 310–11, 176 A. 503, 506 (1935); *accord* 31A C.J.S. Evidence § 199 ("When the party bearing the burden of proof establishes a prima facie case, the adversary has the burden of going forward, that is, offering evidence to contradict the prima facie case[.]"); *cf. Cannon v. Cannon*, 384 Md. 537, 865 A.2d 563, 573 (2005) (reciting that, when a party seeking to enforce a contract generates a *prima facie* case that the contract is valid, the defending party—the one seeking to invalidate the contract—bears the burden of production as to the defenses of fraud, duress, coercion, mistake, undue influence, or incompetence). The approach is grounded in elemental logic and fairness. Indeed, rarely, if ever, does our legal system impose a burden upon one party to parry a potentially limitless series of accusations of wrongdoing by repeatedly proving the negative. Rather, as explained above, when one party makes out a *prima facie* case in its favor ..., it is generally incumbent upon the opposing party to undermine that case in some way.[28]

. . . .

[28] Notably, a pure common law approach would more sharply allocate the actual burden *of proof* to the party asserting the affirmative of a particular issue; indeed, portions of the Pennsylvania Code expressly import this approach, *see, e.g.,* 25 Pa.Code § 1021.122 (governing proceedings before the Environmental Hearing Board and mandating that "the burden of proof shall be the same as at common law in that the burden shall normally rest with the party asserting the affirmative of an issue"), which is also reflected implicitly in other aspects of the Code. *See, e.g.,* 204 Pa.Code § 91.79. This general proposition, that the proponent of a rule bears the burden of supporting it, obtains in other jurisdictions as well. It is made express in the federal system through

the Administrative Procedures Act, *see* 5 U.S.C. § 556(d) ("Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof."); *Kea v. Police & Firemen's Ret. & Relief Bd.,* 429 A.2d 174, 175 (D.C.1981) (same), and it emerges from the cases. *See, e.g., Phila. Co. v. SEC.* 175 F.2d 808, 818 (D.C.Cir.1949) (stating as a general precept that "the burden of proof lies upon him who affirms, not him who denies"); *Estrin v. Moss,* 221 Tenn. 657, 430 S.W.2d 345, 354 (Tenn.1968) ("As in court proceedings the burden of proof, apart from statute, is on the party asserting the affirmative of an issue before an administrative tribunal."). *See generally Pan Am. Petroleum Corp. v. Wyo. Oil & Gas Conservation Comm'n,* 446 P.2d 550, 556 (Wyo.1968) (recognizing that "burden of proof" is "used in a dual sense and may mean the burden of establishing the case as a whole or the burden on a party to make out a prima facie case in his favor at a certain stage during the hearing"). Our recognition that the Bureau bore a mere burden of production is modest, by way of comparison.

*500 James Hance Court,* — Pa. at —, 33 A.3d at 575–76 (emphasis in original). "In civil cases, the burden of proof rests upon the party who asserts the affirmative of an issue. Also, if a negation or negative affirmation be so essential, the proof of such a negative lies on the party so affirming it." *Zubris v. Pennsylvania Assigned Claims Plan,* 321 Pa.Super. 83, 467 A.2d 1139, 1145 (1983).

After considering the language of Section 242.1 and the legal principles cited above, we hold it is the losing school district that bears the burden of proving its entitlement to the payment of its indebtedness and obligations by the receiving school district. Section 242.1 essentially provides the losing school district with the opportunity to receive payment for part of its indebtedness and obligation from the receiving school district, thereby offsetting some of the impact the revenue loss would have on its current indebtedness and obligations. ESASD, as the losing school district, is the party in this matter that is "assert[ing] the affirmative," i.e., that it

has indebtedness and obligations for which WASD should pay a pro-rata share. *500 James Hance Court,* — Pa. at —, 33 A.3d at 575; *Zubris,* 467 A.2d at 1145. Moreover, as a practical matter, neither PTI nor WASD readily have access to ESASD's contracts and bond indebtedness information, requiring them to seek out information from ESASD in order to "repeatedly prov[e] the negative," i.e., the lack of such indebtedness and obligations. *500 James Hance Court,* — Pa. at —, 33 A.3d at 575. Thus, we conclude that ESASD, as the party seeking the affirmative and that benefits from a trial court decision directing WASD to pay a portion of ESASD's indebtedness and obligations, bears the burden of proving the existence and "amount, if any, of the indebtedness and obligations of [ESASD], that [WASD] shall assume and pay." 24 P.S. § 2–242.1.[9]

■ ESASD first argues that the trial court erred in finding that ESASD would lose revenue in the amount of $1.8 million from the transfer of Porter Township to WASD because that amount is not supported by the record. Both PTI and WASD agree that the trial court erred in making this finding, but contend that such error was harmless because the amount of indebtedness and obligations were based, not on the lost revenue, but on the amount of: (1) ESASD's long term contracts and other obligations; and (2) ESASD's indebtedness, i.e., the items expressly cited in Section 242.1 of the School Code.

Our review reveals that this finding was neither essential to the trial court's holding, nor did the trial court rely upon it in concluding that the "per student" formula for ESASD's long term contract and other obligations and the "Local Effort Requirements" formula for ESASD's total indebt-

edness were the correct formulas to use in this case. The actual figures to be used in making the calculations based on these formulas will be determined at the time the transfer occurs. Accordingly, we conclude that any error in the trial court's finding is harmless. *See, e.g., Thomas Jefferson University Hospital v. Workmen's Compensation Appeal Board (Cattalo),* 144 Pa.Cmwlth. 302, 601 A.2d 476, 480 (1991) (holding that an unsupported finding of fact that is not essential to the ultimate determination is a harmless error); *Yacoub v. Lehigh Valley Medical Associates, P.C.,* 805 A.2d 579 (Pa.Super.2002) (stating that for an error in evidentiary rulings to be the basis for a new trial, the rulings must not only be erroneous but also harmful to the complaining party); *Commonwealth ex rel. Buchakjian v. Buchakjian,* 301 Pa.Super. 213, 447 A.2d 617, 622 (1982) (stating "Often an erroneous evidentiary ruling will not require reversal. But where, as here, erroneously admitted evidence goes to the heart of the issue, we must reverse and remand for another hearing.")

■ ESASD next asserts that the trial court erred in determining that WASD's reimbursement of ESASD's long term contracts and other obligations should be based on the number of students using such services rather than on the assessed value of the contracts and obligations. ESASD argues that: (1) the trial court relied on objected-to hearsay, Mr. Bear's testimony regarding what Ms. Nelson told him, in making its determination; and (2) because the hearsay statement was the only evidence to support this formula, the trial court capriciously disregarded Ms.

---

**9.** Notwithstanding this discussion, we note that none of the parties assert that ESASD failed to establish that it was entitled to some

type of pro-rata payment of its debts and obligations.

Bader's testimony that the assessed value method was the proper method.

■ Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa. R.E. 801(c). Absent an exception, hearsay is inadmissible and cannot be admitted and relied upon by the fact finder. *Heddings v. Steele*, 514 Pa. 569, 575, 526 A.2d 349, 352 (1987). We agree with ESASD that Mr. Bear's testimony of what Ms. Nelson told him about the basis of the long term contracts and obligations, i.e., that they are student based, constitutes hearsay, to which ESASD objected during the hearing. Thus, if this is the only evidence in the record to support the trial court's application of the per student ratio, that determination would not be supported by the record.[10] However, after reviewing the record and the reasonable inferences deducible therefrom in the light most favorable to the prevailing party,[11] *MKP Enterprises, Inc. v. Underground Storage Tank Indemnification Board*, 39 A.3d 570, 588 (Pa. Cmwlth.2012), we conclude that there is substantial evidence to support the trial court's adoption of this method. Substantial evidence has been defined as "evidence that a reasonable mind could accept as adequate to support a conclusion." *Id.* Moreover, "evidence will be substantial to support such an inferential finding only when the record evidence is more than a scintilla and creates more than mere suspicion that a particular fact exists." *Id.*

Here, on cross-examination, Ms. Bader acknowledged that at least in some contracts ESASD has staggered the contracts and tries "to replace [computers] based on the level of students so that the high schools are replaced at the same time[,] the intermediates are replaced[,] and the elementary is a little more flexible" and that it is possible to take into account drops in enrollment in deciding to buy the next time ESASD enters into a lease for computers. (Hr'g Tr. at 51–52, R.R. at 60a–61a.) Moreover, she further agreed with the statement that

> it [is] obvious that the number of students you have is a factor in deciding the extent of these [long term] contracts in terms of [the] number of computers you would need and how much staff you would need and things like that, but it is *also* the case that revenue is a factor in deciding how much to spend on these [long term] contracts[.]

(Hr'g Tr. at 68, R.R. at 77a (emphasis added).) Ms. Bader also explained that one of the reasons the districts chose the date for calculating the amount due from WASD was because that date is "when our budget process starts for the next year, so if we had that date, then we would begin doing what we had to do" with regard to adjusting levels of teachers. (Hr'g Tr. at 53–54, R.R. at 62a–63a.) Additionally, Ms. Horan testified that it is possible to make adjustments to long term contracts and obligations to account for lower student enrollment. (Hr'g Tr. at 84, R.R. at 93a.) We conclude that a reasonable mind could accept this testimony, and the reasonable inferences deducible therefrom, as adequate to support the trial court's finding that the per student ratio formula is the proper formula to calculate WASD's payment to ESASD for ESASD's long term

---

10. The trial court's opinion does not reflect whether the trial court relied solely upon the hearsay testimony in making its determination that the application of the per student ratio formula was appropriate.

11. We conclude that, on this particular issue, WASD prevailed because the trial court adopted the formula proposed by WASD, rather than the formula offered by ESASD.

contracts and other obligations. Accordingly the trial court did not err or abuse its discretion in so finding.

██ ESASD last argues that the trial court erred in determining that WASD should share only in the "Local Effort Requirements" rather than the "Debt Service Requirements" of ESASD's total indebtedness. ESASD contends that, in calculating the figure to use as its total indebtedness, the Commonwealth subsidy it receives for school building construction should not be included and the trial court misconstrued the purpose of that subsidy. According to ESASD, the subsidy is irrelevant to the calculation because it receives that subsidy regardless of how it pays for the construction of new school buildings, i.e., cash versus debt, and is based on factors not affected by or resulting from the transfer of Porter Township, citing Section 349.24 of the Department's regulations, 22 Pa.Code § 349.24.[12]

WASD responds that Section 242.1 of the School Code specifically requires the trial court to include a "statement prorating the State subsidies payable between or among the losing district … and the receiving district" and that the "Local Effort Requirements" essentially reflects the subsidy ESASD receives to help offset the cost of its school buildings, i.e., the proration referred to in Section 242.1. 24 P.S. § 2–242.1. WASD further notes that ESASD prepared "Exhibit A," which shows both the "Debt Service Requirements" and "Local Effort Requirements" figures, and that, in calculating the "Local Effort Requirements" amount, ESASD essentially acknowledges that it and its taxpayers are responsible only to pay that amount.

Given the equitable nature of the proceedings and the statutory language, we find WASD's argument more persuasive. Section 242.1 states that subsidies are to be considered and prorated between or among the losing and receiving school districts. Both parties agree that the subsidy follows the building, no ESASD building is affected by the transfer, and ESASD remains responsible for maintaining the buildings to which the subsidies are attached. Essentially, what ESASD seeks here is to continue to receive the subsidy, which offsets a portion of its debt related to a particular school building that it will continue to own and use, *and* to receive a payment from WASD for the same amount of debt.[13] In rejecting ESASD's position, the trial court chose to require WASD to pay ESASD a prorated share of that portion of ESASD's indebtedness for which ESASD and its taxpayers are *actually* responsible. We recognize ESASD's argument that, if it paid cash for a school building, it would still receive the subsidy from the Commonwealth and that WASD should not be entitled to receive credit for that subsidy in a transfer situation. However, in that scenario, there would be *no indebtedness* for which ESASD could seek a prorated payment from WASD pursuant to Section 242.1. Moreover, although Section 349.24 of the Department's regulations does consider factors that are independent of whether a transfer occurs, we conclude it has no bearing on the present determi-

---

**12.** The regulation at 22 Pa.Code § 349.24 outlines the factors the Department will consider when determining reimbursement for construction or renovation of school buildings and equipment, which include the "rated pupil capacity" of the proposed project, justified enrollment figures, and the value of existing facilities. *Id.*

**13.** It would be a different situation if an ESASD school building was located in Porter Township thereby requiring, theoretically, the building's transfer to WASD, which would then be required to maintain the building. We are not presented with that situation here.

nation on what portion of ESASD's indebtedness WASD must pay.

For the foregoing reasons, we hold that the trial court did not err or abuse its discretion in determining the formulas to be used by ESASD, WASD, and PTI to calculate "the amount of indebtedness" that WASD will pay ESASD in this case, should the State Board approve the transfer of Porter Township to WASD. Accordingly, the trial court's order is affirmed.

## ORDER

**NOW,** April 30, 2012, the Order of the Court of Common Pleas of Pike County in the above-captioned matter is hereby **AFFIRMED.**